(Slip Opinion)     OCTOBER TERM, 2004     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ALASKA *v.* UNITED STATES

### ON EXCEPTIONS TO REPORT OF SPECIAL MASTER

No. 128, Orig.   Argued January 10, 2005—Decided June 6, 2005

States are generally entitled "under both the equal footing doctrine and the Submerged Lands Act to submerged lands beneath tidal and inland navigable waters, and under the Submerged Lands Act alone to submerged lands extending three miles seaward of [their] coastline." *United States* v. *Alaska,* 521 U. S. 1, 6, 9 *(Alaska (Arctic Coast))*. The Federal Government can overcome the presumption of title and defeat a future State's claim, however, by setting submerged lands aside before statehood in a way that shows an intent to retain title. *Id.,* at 33–34. Here, Alaska and the United States dispute title to two areas of submerged lands. The first consists of pockets and enclaves of submerged lands underlying waters in the Alexander Archipelago that are more than three nautical miles from the coast of the mainland or any individual island. Alaska can claim these pockets and enclaves only if the archipelago waters themselves qualify as inland waters. The second area consists of submerged lands beneath the inland waters of Glacier Bay, a well-marked indentation into the southeastern Alaskan coast. To claim them, the United States must rebut Alaska's presumption of title. The Special Master recommended that summary judgment be granted to the United States with respect to both areas, concluding that the Alexander Archipelago waters do not qualify as inland waters either under a historic inland waters theory or under a juridical bay theory, and concluding that the United States had rebutted the presumption that title to the disputed submerged lands beneath Glacier Bay passed to Alaska at statehood. Alaska filed exceptions to these conclusions.

*Held*: Alaska's exceptions are overruled. Pp. 4–35.

   (a) The Alexander Archipelago's waters are not historic inland waters. To make a historic waters claim, a State must show that the United States exercises authority over the area, has done so continu-

ously, and has done so with the acquiescence of foreign nations. This "exercise of sovereignty must have been, historically, an assertion of power to exclude all foreign vessels and navigation," *United States* v. *Alaska,* 422 U. S. 184, 197, including vessels engaged in "innocent passage," *i.e.,* passage that does not prejudice the coastal State's peace, good order, or security. Based on his examination of five different periods from 1821 to the present, the Special Master found that Russia and the United States historically have not asserted the requisite authority over the waters of the Alexander Archipelago. The evidence that Alaska points to—including incidents during Russian and early United States sovereignty, and the United States' litigating position during a 1903 arbitration proceeding—is insufficient to demonstrate the continuous assertion of exclusive authority, with acquiescence of foreign nations, necessary to support a historic inland waters claim. Pp. 4–15.

(b) Nor do the Alexander Archipelago's waters qualify as inland waters under the juridical bay theory Alaska advances in the alternative. The claimed juridical bays would exist only if, at minimum, four of the archipelago's islands were deemed to form a constructive peninsula extending from the mainland and dividing the archipelago's waters in two. Yet even assuming, *arguendo,* that each of the islands should be assimilated one to another, Alaska's hypothetical bays still would not meet the criteria for juridical bays set forth in Article 7(2) of the Convention on the Territorial Sea and the Contiguous Zone (hereinafter Convention). In particular, the resulting bodies of water north and south of Alaska's constructive peninsula do not qualify as well-marked indentations under the Convention, for they do not possess physical features that would allow a mariner looking at navigational charts that do not depict bay closing lines nonetheless to perceive the bays' limits in order to avoid illegal encroachment into inland waters. Pp. 15–20.

(c) The United States has rebutted Alaska's presumed title to the submerged lands underlying the waters of Glacier Bay National Monument (now Glacier Bay National Park). The United States can defeat a future State's presumed title to submerged lands by, *inter alia,* setting the lands aside as part of a federal reservation "such as a wildlife refuge." *Idaho* v. *United States*, 533 U. S. 262, 273. To determine whether Congress has used that power, this Court first asks whether the United States clearly intended to include the submerged lands within the reservation. If the answer is yes, the Court then asks whether the United States expressed its intent to retain federal title to the lands within the reservation.

The Special Master's conclusion that the monument, at the time of Alaska's statehood, included the submerged lands underlying Glacier

Bay has strong support in the precedents and whole record of the case, and Alaska does not take exception to it. As for the second question, the Alaska Statehood Act's (ASA) provisions suffice to overcome Alaska's ownership presumption arising from the equal footing doctrine and the Submerged Lands Act (SLA) and to reserve Glacier Bay's submerged lands to the United States.

Under the ASA, Alaska acquired title to any property previously belonging to the Territory of Alaska and the United States retained title to its property located with Alaska's borders, subject to exceptions set forth in ASA §6. The first clause of §6(e) directs a transfer to Alaska of any United States property used "for the sole purpose of conservation and protection of [Alaska's] fisheries and wildlife" under three specified federal laws. The proviso following that clause made clear that the initial clause's directive did not apply to "lands withdrawn or otherwise set apart as refuges or reservations for [wildlife] protection." In *Alaska (Arctic Coast),* this Court held that the proviso expressed congressional intent to retain title to a reservation such as the Alaska National Wildlife Refuge, and that intent was sufficient to defeat Alaska's presumed title under both the equal footing doctrine and the SLA. Alaska cannot avoid that result here.

Alaska's narrow reading—that the proviso applies only to federal property covered by §6(e)'s initial clause, which does not include Glacier Bay—is neither necessary nor preferred. A proviso may refer only to things covered by a preceding clause, but it can also state a general, independent rule. The Court agrees with the United States that the proviso is best read, in light of the interpretation given to it in *Alaska (Arctic Coast),* as expressing an independent and general rule uncoupled from the initial clause. Under the initial clause the United States obligated itself to transfer to Alaska equipment and other property used for general fish and wildlife management responsibilities Alaska was to undertake upon acquiring statehood. Under the proviso the United States expressed its intent, notwithstanding this property transfer, to retain ownership over all federal refuges and reservations set aside for the protection of wildlife, regardless of the specific statutory authority enabling the set-aside. This expression of intent encompassed Glacier Bay National Monument, which was set aside "for the protection of wildlife" within the meaning of §6(e). The text thus defeated the presumption that the new State of Alaska would acquire title to the submerged lands underlying the monument's waters, including the inland waters of Glacier Bay. Pp. 20–35.

Exceptions overruled.

KENNEDY, J., delivered the opinion for a unanimous Court with re-

Syllabus

spect to Parts I, II, III, and IV, the opinion of the Court with respect to Part V, in which STEVENS, O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined, and the opinion of the Court with respect to Part VI, in which STEVENS, O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined, and in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined except as to those portions related to Part V. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 128 Orig.

_____

## STATE OF ALASKA, PLAINTIFF *v.* UNITED STATES OF AMERICA

ON BILL OF COMPLAINT

[June 6, 2005]

JUSTICE KENNEDY delivered the opinion of the Court.

The State of Alaska has invoked our original jurisdiction to resolve its dispute with the United States over title to certain submerged lands underlying waters located in southeast Alaska. Alaska initiated the action by filing a complaint with leave of the Court. 530 U. S. 1228 (2000). We appointed Professor Gregory E. Maggs to act as Special Master in this matter. 531 U. S. 941 (2000). The Special Master gave thorough consideration to the written and oral submissions of the parties. In a detailed report he now recommends the grant of summary judgment to the United States with respect to all the submerged lands in dispute. Report of Special Master 1 (hereinafter Report or Special Master's Report). We set the case for oral argument on Alaska's exceptions to the Special Master's Report. 543 U. S. ___ (2004). For the reasons we discuss, Alaska's exceptions are overruled.

I

We begin by reviewing the general principles elaborated in the resolution of similar submerged lands disputes in our earlier cases.

States enjoy a presumption of title to submerged lands beneath inland navigable waters within their boundaries and beneath territorial waters within three nautical miles of their coasts. This presumption flows from two sources. Under the established rule known as the equal footing doctrine, new States enter the Union "on an 'equal footing' with the original 13 Colonies and succeed to the United States' title to the beds of navigable waters within their boundaries." *United States* v. *Alaska*, 521 U. S. 1, 5 (1997) *(Alaska (Arctic Coast)).* Under the Submerged Lands Act (SLA), 67 Stat. 29, 43 U. S. C. §1301 *et seq.,* which applies to Alaska through an express provision of the Alaska Statehood Act (ASA), §6(m), 72 Stat. 343, the presumption of state title to "lands beneath navigable waters within the boundaries of the respective States" is "confirmed" and "established." 43 U. S. C. §1311(a); see also *Alaska (Arctic Coast)*, 521 U. S., at 5–6. The SLA also "establishes States' title to submerged lands beneath a 3-mile belt of the territorial sea, which would otherwise be held by the United States." *Id.,* at 6. "As a general matter, then, Alaska is entitled under both the equal footing doctrine and the Submerged Lands Act to submerged lands beneath tidal and inland navigable waters, and under the Submerged Lands Act alone to submerged lands extending three miles seaward of its coastline." *Ibid.*

The Federal Government can overcome the presumption and defeat a future State's title to submerged lands by setting them aside before statehood in a way that shows an intent to retain title. *Id.,* at 33–34. The requisite intent must, however, be "'definitely declared or otherwise made very plain.'" *Id.,* at 34 (quoting *United States* v. *Holt State Bank*, 270 U. S. 49, 55 (1926)).

With these principles in mind, we discuss the two areas of submerged land at issue here.

## II

The first area of submerged land in dispute, claimed by Alaska under alternative theories in counts I and II of its amended complaint to quiet title (hereinafter Amended Complaint), consists of pockets and enclaves of submerged lands underlying waters in between and fringing the southeastern Alaska islands known as the Alexander Archipelago. These disputed submerged lands, shown in red and dark blue on the map in Appendix A, *infra,* share a common feature: All points within the pockets and enclaves are more than three nautical miles from the coast of the mainland or of any individual island of the Alexander Archipelago.

For these pockets and enclaves, the dispositive question is whether the Alexander Archipelago's waters qualify as inland waters. If they do, Alaska's coastline would begin at the outer bounds of these inland waters as marked by the black line drawn on the map in Appendix A, *infra.* See 43 U. S. C. §1301(c) ("The term 'coast line' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters"); see also *United States* v. *Alaska*, 422 U. S. 184, 187–188, and n. 5 (1975) *(Alaska (Cook Inlet)).* Under the equal footing doctrine and the SLA, a presumption of state title would then arise as to all the submerged lands underlying both the inland waters landward of this coastline, and also the territorial sea within three nautical miles of it. Because the United States concedes it could not rebut the presumption of state title as to this aspect of the case, Alaska would have title to all the pockets and enclaves of submerged lands in dispute.

If the Alexander Archipelago's waters do not qualify as inland, then they instead qualify as territorial sea. In that case Alaska would have no claim of title to the disputed pockets and enclaves, as these lands are beyond three

nautical miles from the coast of the mainland or any individual island.

The second area of submerged land in dispute, claimed by Alaska in count IV of its Amended Complaint, consists of the submerged land beneath Glacier Bay, a well-marked indentation into the coast of the southeast Alaskan mainland. See Appendixes C, D, *infra* (maps of Glacier Bay). There is no question that Glacier Bay's waters are inland. For the submerged lands underlying these waters, the controlling question is whether the United States can rebut Alaska's presumption of title.

After receiving the parties' written submissions and conducting a hearing, the Special Master recommended that this Court grant summary judgment to the United States with respect to Alaska's claims of title to both areas of submerged land in dispute. Report 1. As to the pockets and enclaves, the Special Master concluded that the waters of the Alexander Archipelago do not qualify as inland waters either under the historic inland waters theory advanced in count I of Alaska's Amended Complaint or under the juridical bay theory advanced in count II. *Id.,* at 137–138, 226. As to the submerged lands underlying Glacier Bay and claimed by Alaska in count IV, the Special Master concluded that the United States has rebutted the presumption that title passed to Alaska at statehood. *Id.,* at 276. Alaska filed exceptions to each of these three conclusions. We address them in turn.

## III

In count I of its Amended Complaint, Alaska alleges that the waters of the Alexander Archipelago are historic inland waters. As this Court has recognized, "where a State within the United States wishes to claim submerged lands based on an area's status as historic inland waters, the State must demonstrate that the United States: (1) exercises authority over the area; (2) has done so continu-

ously; and (3) has done so with the acquiescence of foreign nations." *Alaska (Arctic Coast)*, 521 U. S., at 11. "For this showing," we have elaborated, "the exercise of sovereignty must have been, historically, an assertion of power to exclude all foreign vessels and navigation." *Alaska (Cook Inlet), supra*, at 197.

Nations may exclude from inland waters even vessels engaged in so-called "innocent passage"—passage that "is not prejudicial to the peace, good order or security of the coastal State," Arts. 14(1), 14(4) of the Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, [1964] 15 U. S. T. 1607, 1610 T. I. A. S. No. 5639 (hereinafter Convention). See *United States* v. *Louisiana*, 470 U. S. 93, 113 (1985) *(Alabama and Mississippi Boundary Case)*; *United States* v. *Louisiana*, 394 U. S. 11, 22 (1969). To claim a body of water as historic inland water, it is therefore important to establish that the right to exclude innocent passage has somehow been asserted, even if never actually exercised. See *Alabama and Mississippi Boundary Case*, 470 U. S., at 113, and n. 13. The Court also has considered the "vital interests of the United States" in designating waters as historic inland waters. *Id.,* at 103.

The Special Master recommended that the Court grant summary judgment to the United States on this count. The Special Master first made a thorough examination of historical documents, from 1821 to the present, bearing on the status of the Alexander Archipelago's waters. The Special Master sorted these documents into five distinct periods: (1) Russian sovereignty (1821–1867), Report 23–38; (2) early American sovereignty (1867–1903), *id.*, at 38–55; (3) the 1903 U. S.-Britain Boundary Arbitration, *id.*, at 56–63; (4) later American sovereignty (1903–1959), *id.*, at 63–89; and (5) the poststatehood era (1959–present), *id.*, at 89–107. Based on his examination of the record evidence from all of these periods, the Special Master con-

cluded that "Russia and the United States historically did not assert authority to exclude vessels from making innocent passage through the waters of the Alexander Archipelago." *Id.,* at 109. In the Special Master's view, Alaska had at best "uncovered and presented only 'questionable evidence' that the United States exercised the kind of authority over the waters of the Archipelago that would be necessary to prove a historic waters claim." *Id.*, at 129.

Though Alaska's failure to demonstrate that the waters of the Alexander Archipelago had historically been treated as inland waters would by itself justify granting summary judgment to the United States on count I, the Special Master also addressed other relevant factors, such as the acquiescence of other nations and the vital interests of the United States. In the Special Master's view these factors only strengthened the case for granting summary judgment to the United States.

Excepting to the Special Master's recommendation on count I, Alaska contends the Special Master gave too little weight to historical events that tend to support Alaska's position. By the same token Alaska argues the Special Master gave too much weight to historical events that tend to undermine its position. Alaska also asserts that foreign nations have acquiesced in the treatment of the waters of the Alexander Archipelago as inland waters, and that the interests of the United States support such treatment. We find Alaska's arguments unconvincing.

Rather than canvassing the entire historical record discussed by the Special Master in his thorough, commendable report, we turn our attention to the events Alaska presents as its best evidence that the Alexander Archipelago's waters qualify as historic inland waters.

## A

First in time among the events to which Alaska points are incidents from the period of Russian sovereignty.

These incidents are pertinent to the inquiry because, as we have held, when Russia ceded the territory of Alaska to the United States in 1867, "the United States thereby acquired whatever dominion Russia had possessed." *Alaska (Cook Inlet)*, 422 U. S., at 192, n. 13.

In 1824, the United States and Russia entered into a treaty that, *inter alia*, granted United States vessels the right, over the next 10 years, to "frequent, without any hindrance whatever, the interior seas, gulphs, harbours, and creeks [of the Alexander Archipelago], for the purpose of fishing and trading with the natives of the country." See Convention Between the United States of America and Russia, Art. 4, 8 Stat. 304 (1825) (hereinafter 1824 Treaty or Treaty). In Alaska's view this Treaty demonstrates that "the Russian claim extended to the entire Archipelago" and thus that Russia treated the archipelago waters as inland waters. Exceptions to Report of Special Master and Brief in Support for Plaintiff 29 (hereinafter Exceptions and Brief for Plaintiff Alaska). The principal problem with Alaska's assertion is that the 1824 Treaty by its terms did not address navigation for the purpose of innocent passage, but rather addressed only navigation "for the purpose of fishing and trading with the natives." Even on the questionable assumption that the Treaty's reference to "interior seas" included all the waters of the Alexander Archipelago and not just waters within three nautical miles of the coast of the mainland or any particular island, but see Report 27–28 (refuting this assumption), the Treaty simply does not provide evidence that Russia asserted a right to exclude innocent passage. Yet evidence of the assertion of this right—not some lesser right—must be provided to support an historic inland waters claim. See *Alaska (Cook Inlet), supra*, at 197.

Upon the expiration of the 10-year right granted to United States vessels by virtue of the 1824 Treaty, Russia stationed a brig, the *Chichagoff*, at the southern border of

Russian America.  Alaska implies that Russia's purpose in stationing the brig there was to exclude any foreign vessels from entering the Alexander Archipelago's waters.  See Exceptions and Brief for Plaintiff Alaska 30–31.  Were we to accept this interpretation of the *Chichagoff* incident, we would acknowledge it as some evidence that Russia treated the Alexander Archipelago's waters as inland waters.

As the Special Master noted, however, a report prepared for the 1903 Alaskan Boundary Tribunal (a tribunal we will discuss further) described the *Chichagoff* incident as follows:

> "Governor Wrangell sent the brig *Chichagoff*, under command of Lieutenant Zarembo, to Tongas, near the southern boundary line at 54° 40', for the purpose of intercepting foreign vessels entering the inland waters of the colony, to the masters of which he was to deliver written notice of the expiration of the treaty provisions, being furnished with six copies for American and three for British vessels."  1 Proceedings of the Alaskan Boundary Tribunal, S. Doc. No. 162, 58th Cong., 2d Sess., pt. 2, p. 70 (1904) (footnote omitted) (hereinafter ABT proceedings).

Like the Special Master, we see nothing in this passage to indicate that Russia, through its actions with respect to the *Chichagoff,* asserted a right to exclude from the Alexander Archipelago waters foreign vessels engaged only in innocent passage.  By giving written notice of the expiration of the 1824 Treaty rights, the *Chichagoff* reminded American mariners that they were no longer free to trade with the natives, or to approach within cannon shot of the Russian lands "without any hindrance whatever."  1824 Treaty, Art. 4, 8 Stat. 304.  Russia did not assert thereby the more sweeping right to exclude even vessels engaged only in innocent passage.

Alaska also points to evidence that in 1836 Russian forces apprehended and boarded the American vessel *Loriot* while it was within the Alexander Archipelago waters, and then ordered it "'to leave the waters of His Imperial Majesty.'" Exceptions and Brief for Plaintiff Alaska 30; see also Letter from John Forsyth to G. M. Dallas (May 4, 1837), reprinted in Report of Secretary of State Thomas F. Bayard upon the Seal Fisheries in the Bering Sea, S. Exec. Doc. No. 106, 50th Cong., 2d Sess., 232–233 (1889). Even this incident does not constitute evidence that Russia viewed the archipelago waters as inland waters, however, because the *Loriot* was not engaged in innocent passage. The *Loriot*'s mission, as freely admitted in a contemporary letter written by a State Department official to a member of the United States legation in St. Petersburg, was to visit "the northwest coast of America, for the purpose of procuring provisions, and also Indians to hunt for sea otter on the said coast." *Id.,* at 232. By excluding the *Loriot*, which evidently had tried to exceed the limits of mere "innocent passage," Russia did not, and could not, assert a right to exclude vessels engaged solely in innocent passage.

In sum, none of the incidents Alaska cites from the period of Russian sovereignty support the proposition that Russia treated the waters of the Alexander Archipelago as inland waters prior to ceding Alaska to the United States in 1867.

B

For the period of early U. S. sovereignty between 1867 and 1903, Alaska cites not a single incident demonstrating that the United States acted in a manner consistent with an understanding that the Alexander Archipelago waters were inland. Alaska thus leaves itself with at most 56 years to demonstrate continuous prestatehood treatment of the Alexander Archipelago as inland waters. This alone

constitutes a substantial weakness in Alaska's position.

As to the years between 1867 and 1903, Alaska does attempt to explain away a significant event which under-cuts its claim, but this attempt is unsuccessful.  In 1886, Secretary of State Thomas F. Bayard wrote a letter to Secretary of Treasury Daniel Manning concerning the limits of the territorial waters of the United States on both the northeastern and the northwestern coasts.  See 1 J. Moore, Digest of International Law 718–721 (1906).  The State Department's position with respect to waters surrounding fringing islands on both coasts was that the sovereigns of those islands could only claim a territorial sea of three miles from the coast of each island.  Secretary Bayard explained that, in asserting the 3-mile belt of territorial sea, the United States denied neither "the free right of vessels of other nations to pass, on peaceful errands, through this zone" nor the right "of relief, when suffering from want of necessities, from the shore."  *Id.,* at 720–721.

According to Secretary Bayard, the State Department's position was a well-considered one, rooted in principles of reciprocity and consistent practice:

> "These rights we insist on being conceded to our fishermen in the northeast, where the mainland is under the British sceptre.  We can not refuse them to others on our northwest coast, where the sceptre is held by the United States.  We asserted them . . . against Russia, thus denying to her jurisdiction beyond three miles on her own marginal seas.  We can not claim greater jurisdiction against other nations, of seas washing territories which we derived from Russia under the Alaska purchase."  *Id.,* at 721 (internal quotation marks omitted).

The Special Master singled out this letter as "unambiguously support[ing] the United States' position that the

United States and Russia historically did not assert the right to exclude foreign vessels from the waters of the Archipelago." Report 109. Emphasizing the statements in the letter that the United States could not "'claim greater jurisdiction'" than three miles of marginal seas and that foreign vessels had the right to make "'free transit,'" the Special Master concluded that "[o]fficials who held this belief could not, and evidently did not, claim that the United States could exclude innocent passage through the waters." *Id.,* at 110.

Alaska argues that Secretary Bayard's letter is of minimal relevance because "it was internal correspondence that primarily addressed a dispute on the East coast" and thus "did not announce to any foreign nation that the United States had abandoned a claim to the Archipelago." Exceptions and Brief for Plaintiff Alaska 31–32. Alaska's arguments are unpersuasive. That Secretary Bayard's letter referred to the east coast in no way diminishes the unequivocal nature of its statements with respect to the Alaskan coast. It may be true that no foreign nation ever became aware of Secretary Bayard's letter (though the subsequent publication of the letter in the United States' Digest of International Law gives us reason to believe the contrary). Regardless, Secretary Bayard's letter still provides strong evidence that the United States, as of 1886, did not claim a right to exclude all foreign vessels from the Alexander Archipelago waters and had no intention of doing so. We do not need to parse the letter to see whether it "announce[d] to any foreign nation that the United States had abandoned a claim to the Archipelago," for Alaska can muster no proof that the United States as of 1886 had made any such claim in the first place.

## C

A stronger piece of evidence Alaska identifies to support its historic inland waters claim is a litigating position

taken by the United States during an arbitration proceed-
ing in 1903. This proceeding was before the Alaska
Boundary Tribunal, a body convened to resolve a dispute
between the United States and Britain regarding the land
boundary between southeastern Alaska and Canada.
Report 56–63, 116–119.

In a written submission to the tribunal, the United
States described its view of the "political coast" of Alaska
as enclosing all of the Alexander Archipelago waters, as
shown on the map in Appendix A, *infra.* 4 ABT Proceed-
ings, pt. 1, pp. 31–32 (1903). According to the United
States' submissions, "[t]he boundary of Alaska,—that is,
the exterior boundary from which the marine league [of
the territorial sea] is measured,—runs along the outer
edge of the Alaskan or Alexander Archipelago, embracing
a group composed of hundreds of islands." 5 *id.,* pt. 1, at
15–16. At oral argument before the tribunal, moreover,
counsel for the United States made explicit that the rec-
ognition of such a "political coast" would render all waters
landward of it "just as much interior waters as the interior
waters of Loch Lomond." 7 *id.,* at 611 (1904).

Before the Special Master in the instant case, the
United States sought to discount as mere hypothetical
statements the submissions it had made at the tribunal a
full century prior. The Special Master rejected this view
and instead agreed with Alaska that in its submissions to
the tribunal the United States "was expressing a consid-
ered analysis of the [Alexander Archipelago] area, not
merely speaking hypothetically for the purpose of showing
a flaw in Britain's argument." Report 61. Ultimately,
however, the Special Master still concluded that the
United States' submissions to the tribunal were "not an
adequate assertion of authority over the waters of the
Alexander Archipelago." *Id.,* at 118. The Special Master
noted that the issue before the 1903 tribunal was not
"[t]he status of the waters of the Alexander Archipelago,"

*ibid.*, but rather the land boundary between southeast Alaska and Canada; that the United States' declarations regarding the status of the Alexander Archipelago took up "only a few paragraphs in a seven volume record"; and that "[f]or these reasons, it would be unrealistic to conclude that counsel's assertions at the tribunal should have made foreign nations (other than Britain) aware that the United States was asserting a right to exclude them." *Ibid.*

Alaska responds that the Special Master was incorrect to conclude that the United States' submissions in 1903 could not have made foreign nations other than Britain aware of its claim. Alaska argues that Norway became aware of the United States' submissions and then relied on them in its dispute with the United Kingdom in the well-known *Fisheries Case (U. K.* v. *Nor.),* 1951 I. C. J. 116 (Judgment of Dec. 18). As the Special Master explained, however, "[t]he ability of one foreign nation to discover the United States' argument when litigating a related issue . . . does not mean that foreign nations should have known of the United States' position." Report 118, n. 34. This reasoning carries particular force in light of the precedent a contrary conclusion would create. If this Court were to recognize historic inland waters claims based on arguments made by counsel during litigation about nonmaritime boundaries, "the United States would itself become vulnerable to similarly weak claims by other nations that would restrict the freedom of the seas." Reply Brief for United States in Response to Exceptions of the State of Alaska 15–16 (hereinafter Reply Brief for United States). We are reluctant to create a precedent that would have this effect.

D

The litigating position taken by the United States at the ABT Proceedings at best would provide weak support for

inland status of the Alexander Archipelago waters even were we to accept it as signaling a significant change from the view expressed in Secretary Bayard's letter of 1886; for there is little evidence that the United States later acted in a manner consistent with this litigating position. Alaska says that the United States asserted control over the waters by enacting and enforcing fishery regulations in the Alexander Archipelago during the first half of the 20th century. Exceptions and Brief for Plaintiff Alaska 25–29. In particular, Alaska cites the 1906 Alien Fishing Act, 34 Stat. 263, which prohibited foreign, but not domestic, commercial fishing "in any of the waters of Alaska." As its sole evidence that the Act was enforced even in the pockets and enclaves at issue, Alaska cites the seizure by the United States Coast Guard in 1924 of the Canadian vessel *Marguerite*, whose captain was fined $100 for fishing in contravention of the Act.

Assuming, *arguendo,* that the *Marguerite* was seized in one of the disputed pockets or enclaves, a point which the Special Master found unclear, Report 67–68, this one incident hardly suffices to demonstrate a continuous policy. Indeed, contrary authority exists. In 1934 the Departments of State and Commerce exchanged letters expressing their shared understanding that the United States lacked the power to enforce the Act more than three miles from the shore of any island or the mainland. *Id.,* at 70–71 (quoting Letter from Daniel C. Roper, Secretary of Commerce, to Secretary of State 1 (Sept. 5, 1934) ("'Canadian fishermen may operate [in the Alexander Archipelago waters] so long as they remain outside the three mile limit'"); Letter from William Phillips, Under Secretary of State, to Secretary of Commerce 1 (Sept. 13, 1934) (expressing appreciation for the assurance "'that the Fishery laws and regulations will be enforced by the Bureau of Fisheries in conformity with the view that Canadian fishermen may operate [in the Alexander Archipelago

waters] so long as they remain outside the three-mile limit'")). This understanding was inconsistent with a view of the Alexander Archipelago waters as inland. Report 70–71, 110–111.

Even were the seizure of the *Marguerite* taken as evidence of a right asserted by the United States in 1924, the official correspondence cited by the Special Master establishes that by 1934 the United States had reverted to the position taken in Secretary Bayard's 1886 letter. As the United States observes, furthermore, the fact that Britain protested the seizure of the *Marguerite* indicates that any claim of right implied from that seizure was not one in which foreign nations acquiesced. Reply Brief for United States 17, n. 10.

Alaska also refers to various poststatehood events which, in its view, confirm the status of the Alexander Archipelago waters as inland waters. We find insufficient prestatehood evidence to establish inland waters status in the first place, and so we find it unnecessary to discuss these further events.

At best, Alaska's submissions before this Court establish that the United States made one official statement—in the 1903 Alaska Boundary Arbitration—describing the Alexander Archipelago waters as inland, and that the United States seized one foreign vessel—the *Marguerite*—in a manner arguably consistent with the status of those waters as inland. These incidents are insufficient to demonstrate the continuous assertion of exclusive authority, with acquiescence of foreign nations, necessary to support an historic inland waters claim. Alaska's exception to the Special Master's recommendation on count I of the Amended Complaint is overruled.

IV

In count II of its Amended Complaint, Alaska presents an alternative theory to justify treating the Alexander

Archipelago's waters as inland.  Alaska's alternative
theory is that the waters of the Alexander Archipelago in
truth consist of two vast, but as yet unnoticed, juridical
bays.  Waters within a juridical bay would be deemed
inland waters.  Art. 5(1) of the Convention, 15 U. S. T., at
1609.  Thus, if accepted, Alaska's theory would render all
the Alexander Archipelago's waters inland waters to the
extent they lie within the limits of the bays Alaska identi-
fies.  For this reason, and because the United States would
not be able to rebut the presumption of title that would
arise from inland waters status, Alaska's alternative
theory would require the Court to accept Alaska's claim of
title to the pockets and enclaves in dispute.

The parties agree that Alaska's claimed juridical bays
would exist only if four of the Alexander Archipelago's
islands—Kuiu Island, Kupreanof Island, Mitkof Island,
and Dry Island—were deemed to be connected to each
other and to the mainland.  We have recognized that such
"assimilat[ion]" of islands fringing the mainland is possi-
ble, albeit only in "exceptional case[s]" in which "an island
or group of islands . . . 'are so integrally related to the
mainland that they are realistically parts of the "coast."'"
*United States* v. *Maine,* 469 U. S. 504, 517 (1985) (quoting
*United States* v. *Louisiana,* 394 U. S., at 66).  If the as-
similation Alaska urges were accepted, the four islands
Alaska has identified would form a constructive peninsula
extending from the mainland and dividing the Alexander
Archipelago's waters in two.  To bolster its case, Alaska
labels the waters north and south of this hypothetical
peninsula the "North Bay" and the "South Bay."  See
Appendix B, *infra* (map showing Alaska's hypothetical
peninsula and the resulting bays).

Were we to accept Alaska's hypothetical peninsula, we
would then be required to determine whether North Bay
and South Bay in fact qualify as juridical bays under the
Convention, which we have customarily consulted for

purposes of "determining the line marking the seaward limit of inland waters of the States." *United States* v. *Maine, supra,* at 513. Article 7(2) of the Convention sets forth the following geographic criteria for deciding whether a body of water qualifies as a bay:

> "For the purposes of these articles, a bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast. An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation." 15 U. S. T., at 1609.

This definition can be understood to comprise a number of elements. To apply the definition to a given body of water, one must first determine whether the body of water satisfies the descriptive test of being a "well-marked indentation." One must then determine, among other things, whether the indentation's area satisfies the mathematical "semi-circle" test set forth in the second sentence of Article 7(2).

After due consideration of the parties' arguments, the Special Master recommended that the Court reject Alaska's alternative theory. The Special Master first conducted a detailed assessment of the propriety of assimilating the four islands in question in order to form the constructive peninsula so critical to Alaska's theory. Report 147–197. Applying the principles set forth in *United States* v. *Maine, supra,* at 514–520, and *United States* v. *Louisiana, supra,* at 60–66, the Special Master concluded that assimilation would be unwarranted save for two inconsequential channels that "do not suffice to create the juridical bays alleged by Alaska." Report 197. In the alternative, the Special Master concluded that, even

were Alaska's hypothetical peninsula accepted, neither "North Bay" nor "South Bay" could satisfy the descriptive test that a proposed bay constitute a "'well-marked indentation.'" *Id.,* at 222.

Excepting to the Special Master's recommendations, Alaska makes a detailed argument that this Court's precedents regarding assimilation of islands support recognition of the constructive peninsula Alaska has identified. Exceptions and Brief for Plaintiff Alaska 39–45. Alaska further contends that, once this peninsula is recognized, the resulting bodies of water satisfy all the criteria set forth in the Convention. *Id.,* at 45–49.

We overrule Alaska's exception. For the sake of brevity we assume, *arguendo,* that each of the islands in Alaska's hypothetical peninsula should be assimilated one to another (though we are aware of, and Alaska itself cites, no precedent foreign or domestic in which such a massive amount of successive assimilation has been accepted for the purpose of identifying a juridical bay). Even with the benefit of this daunting doubt Alaska could not prevail, for its hypothetical bays do not satisfy the Convention's descriptive requirement of being well-marked indentations.

To qualify as a well-marked indentation, a body of water must possess physical features that would allow a mariner looking at navigational charts that do not depict bay closing lines nonetheless to perceive the bay's limits, and hence to avoid illegal encroachment into inland waters. See G. Westerman, The Juridical Bay 82–85 (1987). Alaska's hypothetical bays do not possess these features. We have been referred to no authority which indicates that a mariner looking at an unadorned map of the southeast Alaskan coast has ever discerned the limits of Alaska's hypothetical bays. So subtle are these limits that even Alaska itself did not discover them until after it had filed its first complaint in this action. Compare Complaint to Quiet Title (Nov. 24, 1999) with Amended Complaint

(Dec. 14, 2000). The test is what mariners see, not what litigators invent. Alaska's hypothetical bays would not be discernible to the eye of the mariner.

A comparison to *United States* v. *Maine*, 469 U. S., at 514–520, makes clear the force of our conclusion. In that case the Court considered whether Long Island Sound and Block Island Sound together qualify as a juridical bay. In determining that they do, the Court held that Long Island itself should be assimilated to the mainland. *Id.,* at 517–520. The Court then determined that the resulting indentation formed by Long Island Sound and Block Island Sound satisfied the requirements of Article 7(2) of the Convention, including the descriptive requirement of being a "well-marked indentation." *Id.,* at 515, 519.

There is a critical difference between this body of water and the bodies of water Alaska has christened as North Bay and South Bay. Even before this Court held that Long Island Sound and Block Island Sound qualified together as a juridical bay, mariners and geographers had recognized Long Island Sound and Block Island Sound as adjacent, cohesive bodies of water—indeed, as "sound[s]," which itself is a term used to describe a wide and deep bay, or a strait connecting other bodies of water. See Webster's Third New International Dictionary 2176 (1981) (defining "sound" as "a long and rather broad inlet of the ocean generally with its larger part extending roughly parallel to the coast"; "a long passage of water connecting two larger bodies but too wide and extensive to be termed a strait"). Nothing of the sort can be said of Alaska's claimed bays. It is not just that no mariner and no geographer (and not even Alaska's litigators) before this action recognized Alaska's claimed bays as bays or sounds. It appears that no one before this action recognized Alaska's claimed bays as constituting cohesive bodies of water at all.

Even accepting the constructive peninsula Alaska has

crafted out of four separate islands within the Alexander
Archipelago, Alaska's claimed bays still fail to qualify as
"well-marked indentations" for purposes of the Conven-
tion. For this reason, we reject the alternative theory
Alaska urges in count II of its Amended Complaint.
Alaska's exception to the Special Master's recommenda-
tion on this count is overruled.

V

In count IV of its Amended Complaint, Alaska claims
title to the submerged lands underlying the waters of
Glacier Bay National Monument (now known as Glacier
Bay National Park), located at the northern end of the
Alexander Archipelago. Concluding that the United
States had rebutted Alaska's presumed title to these
lands, the Special Master recommended granting sum-
mary judgment to the United States. As with the other
aspects of this case, the Special Master was correct in his
interpretation and application of the controlling prece-
dents and principles, and we overrule Alaska's exception
to his recommendation.

A

The centerpiece of Glacier Bay National Park is Glacier
Bay itself. By contrast to the bays Alaska claims in count
II, Glacier Bay is a textbook example of a juridical bay. Its
waters mark a dramatic indentation within the coastline
of the Alaskan mainland. While the width of Glacier Bay's
mouth measures 5 miles at most, the bay's waters stretch
more than 60 miles into the mainland. See Appendix C,
*infra* (map of Glacier Bay).

Glacier Bay National Park is one of the Nation's largest
national parks, embracing over 3.2 million acres, an area
larger than the State of Connecticut. Rennicke, North to
Wild Alaska, National Geographic Traveler 48, 55
(July/Aug. 1994). John Muir, who first saw the bay and its

surroundings in 1879, described it as a "'solitude of ice and snow and newborn rocks.'" *Id.,* at 56. One way to comprehend the solitude is to note that in the area of Glacier Bay there are still not more than 10 miles of established hiking trails. See *id.*, at 50. As the world's largest marine sanctuary, it is, in one sense, a water park.

A ship in the waters of the Pacific in the Gulf of Alaska reaches Glacier Bay by heading shoreward to the east through Cross Sound and to Bartlett Cove, there turning to proceed through the bay in a generally northwest direction. See Appendix D, *infra*. The entrance to the bay near Bartlett Cove is about 100 miles northwest of Juneau and still 600 miles southeast of Anchorage.

The bay owes its name to Captain Beardslee of the United States Navy, who, upon first entering the bay in 1880, was so impressed by the ice formations surrounding it that he called it Glacier Bay. 5 New Encyclopaedia Britannica 290 (15th ed. 2003). A glacier is a large formation of perennial ice. The definition used by the Special Master was a "'mixture of ice and rock that moves downhill over a bed of solid rock or sediment under the influence of gravity.'" Report 246. Some of the glaciers in the region are tidewater glaciers, so called because they end at the water's edge. Even large ships must take precautions near these glaciers, for ice can break off (a process called calving); and when a large segment plunges to the sea, it becomes an iceberg. *Ibid.*

The weight of a glacier can cause it to move, either advancing to crush the life before it or receding to allow life forms to begin anew. At Glacier Bay some of the glaciers are advancing, some are receding, and others seem to be stable. See *id.*, at 246–247.

At least in Glacier Bay, the extreme slowness suggested by the term "glacial" is inapt, for the ice once present where the bay now extends receded with (in a geological context) astounding speed. When Captain George Van-

couver visited in 1794, the bay was but 5 miles inward from Bartlett Cove, while today it penetrates inland for over 60 miles. This retreat of the ice is "considered the fastest glacial withdrawal in recorded history. 'Unzipping,' the geologists call it. The landscape dancing in geologic time." Rennicke, *supra*, at 56. The advance and retreat of the glaciers are of great interest to scientists, and in the areas of glacial recession the submerged floor of the bay is contoured or sculptured in ways that can be studied to learn more of glacial movement and geologic formations. See Report 246–248.

The immense scene is one of remarkable beauty, and the waters, which accommodate large vessels, can be calm enough so that kayaks can be used to explore the bay and its surroundings. Where glaciers have retreated either in the bay or on shore, the retreat reveals how a new life cycle begins. Plant succession is of absorbing interest. "It can be almost like a chant: lichens and algae, moss and dryas, fireweed, willows, alder, and spruce." Rennicke, *supra,* at 56.

The bay and the surrounding shore and forest areas of the park sustain a chain of fish, bird, and animal life. Over 200 avian species have been noted, most of these in or near the marine environment. Glacier Bay: A Guide to Glacier Bay National Park and Preserve, Alaska 78 (1983). There are mussels and crabs on the shore, and in the bay's waters there are numerous fish, including herring and salmon. The light in the long days of summer, and the oxygen-rich waters, accelerate phytoplankton populations, and this is part of the food chain working up to the herring and salmon, then porpoises, seals, and sea lions. The bay also has whales, including the humpback whale. K. Jettmar, Alaska's Glacier Bay: A Traveler's Guide 53 (1997).

In the 1930's, when naturalists and other observers were supporting the movement to expand Glacier Bay

National Monument beyond its initial boundaries, the brown bear became the flagship species for the cause. Declaration of Theodore R. Catton 51, Exhibits to Reply of United States in Support of Motion for Partial Summary Judgment on Count IV of Amended Complaint, Tab No. 3 (Exh. U. S. IV–3). One of the largest of omnivores, the brown bear's food in estuarine areas includes "vegetation, invertebrates (clams, mussels, worms, barnacles, amphipods), carcasses of fish and marine mammals washed onto the beach, and winter-killed ungulates . . . ." Declaration of Victor Barnes 3 (Exh. U. S. IV–6). Brown bears find salmon in streams, and (with distressing frequency) they can swim to the small islands to raid the nesting places of birds and water fowl. *Id.,* at 9. When bears swim in the bay, they are particularly vulnerable to hunters. When he was considering the proposal to extend the boundaries of the Glacier Bay National Monument, President Franklin Roosevelt was angered by accounts of bears being shot from pleasure yachts. *Id.,* at 16.

Reference to the complex ecosystem of Glacier Bay and the surrounding land is important for understanding the purposes that led the United States to create Glacier Bay National Monument. These purposes, in turn, inform the inquiry whether title to the submerged land underlying the waters of Glacier Bay National Monument passed to Alaska at statehood. See *Idaho* v. *United States*, 533 U. S. 262, 274 (2001) (describing the inquiry as encompassing the question whether "the purpose of the reservation would have been compromised if the submerged lands had passed to the State"); *Alaska (Arctic Coast)*, 521 U. S., at 42–43 (noting that "defeating state title . . . was necessary to achieve the United States' objective [of] securing a supply of oil and gas that would necessarily exist beneath uplands and submerged lands").

B

Owing to Glacier Bay's status as a juridical bay, its waters qualify as inland navigable waters. All the remaining waters within the boundaries of Glacier Bay National Monument as it existed at statehood, moreover, lie less than three nautical miles from the coastline. Under both the equal footing doctrine and the SLA, therefore, a strong presumption arises that title to the lands underlying all the waters in dispute in count IV of Alaska's Amended Complaint passed to Alaska at statehood. See *supra*, at 2–3, 4–5; see also *Alaska (Arctic Coast)*, *supra,* at 33–36. The controlling question here is whether the United States can rebut this presumption.

It is now settled that the United States can defeat a future State's presumed title to submerged lands not only by conveyance to third parties but also by setting submerged lands aside as part of a federal reservation "such as a wildlife refuge." *Idaho* v. *United States, supra,* at 273; *Alaska (Arctic Coast)*, 521 U. S., at 33–34. To ascertain whether Congress has made use of that power, we conduct a two-step inquiry. We first inquire whether the United States clearly intended to include submerged lands within the reservation. If the answer is yes, we next inquire whether the United States expressed its intent to retain federal title to submerged lands within the reservation. *Id.,* at 36; *Idaho* v. *United States, supra,* at 273. "We will not infer an intent to defeat a future State's title to inland submerged lands 'unless the intention was definitely declared or otherwise made very plain.'" *Alaska (Arctic Coast), supra,* at 34 (quoting *Holt State Bank*, 270 U. S., at 55).

After careful consideration of the parties' arguments, the Special Master recommended granting summary judgment to the United States on Alaska's claim of title to the submerged lands underlying Glacier Bay. Report 227–276. His recommendation rested on two conclusions that

track the two-part test developed in our precedents. First, he concluded that in creating Glacier Bay National Monument the United States had reserved the submerged lands underlying Glacier Bay and the remaining waters within the monument's boundaries. *Id.,* at 264. Second, he concluded that §6(e) of the ASA, 72 Stat. 340–341, note preceding 48 U. S. C. §21, p. 320, expressed Congressional intent to retain those submerged lands in federal ownership. Report 276.

Alaska takes exception only to the Special Master's second conclusion. We nonetheless explain the Special Master's first conclusion (and our own), for it is a necessary part of the reasoning for the second step of the analysis.

C

We need not detain ourselves long with the first part of the test regarding title to submerged lands. In 1925, President Calvin Coolidge invoked the Antiquities Act of 1906, ch. 3060, 34 Stat. 225, 16 U. S. C. §431 *et seq.,* to create Glacier Bay National Monument. Proclamation No. 1733, 43 Stat. 1988 (1925 Proclamation). In 1939, President Franklin D. Roosevelt issued a proclamation expanding the monument to include all of Glacier Bay's waters and to extend the monument's western boundary three nautical miles out to sea. Proclamation No. 2330, 3 CFR 28 (Supp. 1939) (1939 Proclamation). See Appendix C, *infra* (depicting both the initial boundaries established by the 1925 Proclamation and the expanded boundaries established by the 1939 Proclamation). In 1955, President Dwight D. Eisenhower issued a proclamation slightly altering the monument's boundaries, but leaving the bay's waters within them. Proclamation No. 3089, 3 CFR 24 (Supp. 1955) (1955 Proclamation). In 1980, Congress designated the monument as part of Glacier Bay National Park and Preserve and expanded the resulting reservation's boundaries. 16 U. S. C. §410hh–1(1); see Appendix

D, *infra* (map of Glacier Bay National Park). For present purposes, however, the important point is that by the time Alaska achieved statehood in 1959, the Glacier Bay National Monument had already existed for 34 years as a federal reservation.

After considering the evidence submitted by both parties, the Special Master concluded that "the Glacier Bay National Monument, as it existed at the time of statehood, clearly included the submerged lands within its boundaries." Report 263–264. According to the Special Master, the descriptions of the monument in the 1925, 1939, and 1955 Proclamations themselves showed that the monument embraced submerged lands. *Id.,* at 232–242. The Special Master also considered it significant that exclusion of the submerged lands would have undermined at least three of the purposes that led the United States to create Glacier Bay National Monument. Exclusion of the submerged lands would impair scientific study of the majestic tidewater glaciers surrounding the bay. *Id.,* at 245–251. It would also impair efforts both to study and to preserve the remnants of "'interglacial forests,'" which can be found both above and below the tideline. *Id.,* at 251–253. Finally, exclusion of the submerged lands would compromise the goal of safeguarding the flora and fauna that thrive in Glacier Bay's complex and interdependent ecosystem. *Id.,* at 253–263.

The Special Master, in our view, had ample support for his conclusions that all of these were purposes for creation of the monument, and each would be compromised were it to be determined that submerged lands were not included in the monument. His ultimate determination, that Glacier Bay National Monument included the submerged lands within its boundaries, has strong support in the precedents and in the whole record of the case. Alaska has not filed a formal exception to this determination, and the four-sentence footnote in Alaska's brief which ex-

presses disagreement with it, Exceptions and Brief for Plaintiff Alaska 10–11, n. 4, does not in our view suffice to impeach its validity.

## D

Having established the proposition that the Glacier Bay National Monument, at the time of Alaska's statehood, included the submerged lands underlying Glacier Bay, we turn to the remaining question: whether the United States "'definitely declared or otherwise made very plain'" its intent to defeat Alaska's title to these submerged lands. *Alaska (Arctic Coast),* 521 U. S., at 34 (quoting *Holt State Bank*, 270 U. S., at 55).

### 1

The requisite expression of intent might conceivably reside in the very proclamations that invoked the Antiquities Act of 1906 to create and then expand Glacier Bay National Monument. It is clear, after all, that the Antiquities Act empowers the President to reserve submerged lands. *United States* v. *California,* 436 U. S. 32, 36 (1978). An essential purpose of monuments created pursuant to the Antiquities Act, furthermore, is "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U. S. C. §1. From these two premises it would require little additional effort to reach a holding that the Antiquities Act itself delegated to the President sufficient power not only to reserve submerged lands but also to defeat a future State's title to them. Given the reasons motivating the creation of Glacier Bay National Monument and the overall complexity of the Glacier Bay ecosystem, it would be unsurprising to find that the relevant proclamations manifested intent to retain federal title.

One *amicus* has advanced this argument at length, and the United States foreshadows it in a footnote. See Brief for National Parks Conservation Association as *Amicus Curiae* 6–7, 13–16; Reply Brief for United States 32, n. 20. If true, this argument would provide a powerful alternative basis for agreeing with the Special Master's recommendation to grant summary judgment to the United States with respect to Alaska's claim of title to the submerged lands underlying Glacier Bay.

We need pursue this alternative basis no further, however. In our view the provisions of the ASA themselves suffice to overcome the state ownership presumption arising from the equal footing doctrine and the SLA and to reserve the submerged lands in Glacier Bay to the United States.

2

The Special Master agreed with the United States that Congress expressed an intent to retain title to all of Glacier Bay National Monument, including the submerged lands within it, in §6(e) of the ASA. Report 276. To understand §6(e), we begin by considering its context within the ASA, its text, and the construction we have given to it in an earlier case.

Section 5 of the ASA sets forth a guiding principle regarding title to property within Alaska's boundaries:

> "The State of Alaska and its political subdivisions, respectively, shall have and retain title to all property, real and personal, title to which is in the Territory of Alaska or any of the subdivisions. Except as provided in section 6 hereof, the United States shall retain title to all property, real and personal, to which it has title, including public lands." 72 Stat. 340.

Based on this provision, the new State of Alaska acquired title to any property previously belonging to the Territory

of Alaska. The United States, in turn, retained title to its property located within Alaska's borders, "including public lands," subject to certain exceptions set forth in §6 of the ASA.

One of those exceptions is contained in §6(e), which provides in pertinent part:

> "All real and personal property of the United States situated in the Territory of Alaska which is specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska, under the provisions of the Alaska game law of July 1, 1943 (57 Stat. 301; 48 U. S. C., secs. 192–211), as amended, and under the provisions of the Alaska commercial fisheries laws of June 26, 1906 (34 Stat. 478; 48 U. S. C., secs. 230–239 and 241–242), and June 6, 1924 (43 Stat. 465; 48 U. S. C., secs. 221–228), as supplemented and amended, shall be transferred and conveyed to the State of Alaska by the appropriate Federal agency: . . . *Provided,* That such transfer shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife nor facilities utilized in connection therewith, or in connection with general research activities relating to fisheries or wildlife." *Id.,* at 340–341.

The first quoted part of §6(e), the initial clause, directs a transfer to Alaska of any federal property located in Alaska and used "for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska" under three particular federal game and wildlife laws. The next quoted part, the proviso, makes clear that the transfer directive in the initial clause has no application to "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife."

In *Alaska (Arctic Coast),* we held that the proviso of §6(e) expressed congressional intent to retain title to a

reservation such as the Alaska National Wildlife Refuge (ANWR), and that the statute's declaration of intent was sufficient to defeat Alaska's presumed title under both the equal footing doctrine and the SLA. "In §6(e) of the ASA, Congress clearly contemplated continued federal ownership of certain submerged lands—both inland submerged lands and submerged lands beneath the territorial sea—so long as those submerged lands were among those 'withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife.'" 521 U. S., at 56–57 (quoting §6(e)). If the proviso of §6(e) applies to Glacier Bay National Monument, as we held it applied to ANWR in *Alaska (Arctic Coast)*, then it follows that title to the submerged lands underlying Glacier Bay did not pass to Alaska at statehood.

To avoid this reasoning, Alaska first argues that the proviso is limited in scope to federal property already covered by the initial clause; because Glacier Bay is not covered by the initial clause, the State contends, it is not covered by the proviso either. Alaska next argues that even assuming the scope of the proviso is broader than the initial clause, Glacier Bay was not "set apart" "for the protection of wildlife." We reject both of Alaska's arguments.

a

Regarding the relationship between the initial clause and the proviso, Alaska contends the proviso applies only to wildlife refuges or reservations set aside under the three particular federal game and wildlife statutes named in the initial clause. Glacier Bay National Monument was not set aside under any of these particular statutes, of course; so Alaska says that omission from the initial clause dictates omission from the proviso. The United States counters that the initial clause is confined to specific property but that the proviso is a statement of intent

to retain federal title which extends to all reservations thus described without regard to the specific statutory authority under which the reservations were set aside.

As the Special Master noted, generalizations about the relationship between a proviso and a preceding clause prove to be of little help in resolving the parties' disagreement about the scope of §6(e)'s proviso. Report 268. Though it may be customary to use a proviso to refer only to things covered by a preceding clause, it is also possible to use a proviso to state a general, independent rule. "[A] proviso is not always limited in its effect to the part of the enactment with which it is immediately associated; it may apply generally to all cases within the meaning of the language used." *McDonald* v. *United States*, 279 U. S. 12, 21 (1929); see also 2A N. Singer, Statutes and Statutory Construction §47:08, p. 238 (2000).

We conclude that Alaska's narrow reading of the proviso is neither necessary nor preferred. Section 6(e) begins with specificity. It covers "all real and personal property" "specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska" as identified under three particular federal game and wildlife laws. Those provisions, in turn, make clear that the initial clause's transfer requirement applies to facilities such as certain fish hatcheries, and likely would include specific types of equipment or even vehicles.

Having thus transferred the identified "property," the section proceeds to state a more general reservation, using the word "lands." "*Provided*, [t]hat such transfer shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife nor facilities . . . ." The lands here in question were in fact "withdrawn or otherwise set apart," that is to say by the proclamations which created the monument. Though it may not be the usual style, it does not strike us as illogical for the draftsperson of a statute to write it so that it transfers

some specific real and personal property and then proceeds to reserve lands in a much larger classification.

Alaska's insistence that the proviso must be limited to what is contained at the outset is foreclosed as well by the decision in *Alaska (Arctic Coast)*. In the proceedings leading up to that decision, Alaska had argued that §6(e)'s proviso did nothing more than to except lands from the transfer effected in §6(e)'s initial clause. In Alaska's view, even lands covered by the proviso could still be transferred by virtue of the SLA made applicable to Alaska via §6(m) of the ASA. See Reply Brief for State of Alaska in *United States* v. *Alaska,* O. T. 1996, No. 84, Orig., pp. 44–45. The Court rejected Alaska's view:

> "If [the Arctic National Wildlife Range is covered by §6(e)'s proviso], then the United States retained title to submerged lands as well as uplands within the Range. This is so despite §6(m) of the Statehood Act, which applied the Submerged Lands Act of 1953 to Alaska. The Submerged Lands Act operated to confirm Alaska's title to equal footing lands and to transfer title to submerged lands beneath the territorial sea to Alaska at statehood, *unless* the United States clearly withheld submerged lands within either category prior to statehood. In §6(e) of the Statehood Act, Congress clearly contemplated continued federal ownership of certain submerged lands—both inland submerged lands and submerged lands beneath the territorial sea—so long as those submerged lands were among those 'withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife.'" 521 U. S., at 56–57 (emphasis in original).

Thus we have held that §6(e)'s proviso operates not just negatively and parasitically, only to except refuges or reservations "set apart" for "the protection of wildlife" from the transfer effected by §6(e)'s main clause, but also

affirmatively and independently, as an expression of Congress' intent to retain federal ownership over all lands within such reservations.

This affirmative and independent expression of intent logically applies with just as much force to reservations that fall within §6(e)'s initial clause as to those that do not. It would have made little sense for Congress to differentiate between those two sets of reservations in making the broad statement of intent we have construed §6(e)'s proviso to set forth. It would have made even less sense to differentiate in such a way as to exclude reservations set aside pursuant to the Antiquities Act, like Glacier Bay National Monument. The differentiation suggested by Alaska's reading, moreover, cannot be discerned from the text of §6(e)'s proviso, which covers all reservations set aside "for the protection of wildlife," regardless of the specific authority under which those reservations were set aside.

Alaska is correct to note that our decision in *Alaska (Arctic Coast)* did not directly address the relationship between the initial clause and the proviso in §6(e). As Alaska observes, it appears that we assumed the ANWR would fall within §6(e)'s initial clause were it not for the proviso. *Id.,* at 60–61. For the reasons we have explained, however, the broad construction we gave to the proviso in *Alaska (Arctic Coast)* of necessity carries consequences for the relationship between it and the initial clause.

b

Anticipating the possibility that its narrow interpretation of the proviso might be rejected, Alaska raises one last argument. The proviso does not reach Glacier Bay even under a broad view of the proviso's scope, Alaska contends, because Glacier Bay was not set apart "for the protection of wildlife" within the meaning of §6(e).

This argument can be rejected without extended discus-

sion. As the Special Master noted and as we have recognized, Congress has made clear that one of the fundamental purposes of wildlife reservations set apart pursuant to the Antiquities Act is "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U. S. C. §1. Because Glacier Bay National Monument serves as habitat for many forms of wildlife, it was set aside in part for its preservation. Any doubt as to this conclusion is dispelled by reference to the Presidential proclamations setting aside the monument, for the proclamations identify the study of flora and fauna as one of the express purposes of the reservation. 1925 Proclamation, 43 Stat. 1988; 1939 Proclamation, 3 CFR 28 (Supp. 1939). As the Special Master observed, the study of flora and fauna necessarily requires their preservation. Report 274.

In sum we agree with the United States that the proviso is best read, in light of our prior interpretation of it in *Alaska (Arctic Coast)*, as expressing an independent and general rule uncoupled from the initial clause. Under the initial clause the United States obligated itself to transfer to Alaska equipment and other property used for general fish and wildlife management responsibilities Alaska was to undertake upon acquiring statehood. Under the proviso the United States expressed its intent, notwithstanding this property transfer, to retain ownership over all federal refuges and reservations set aside for the protection of wildlife, regardless of the specific statutory authority enabling the set-aside. This expression of intent encompassed Glacier Bay National Monument, which was set aside "for the protection of wildlife" within the meaning of §6(e). The text thus defeated the presumption that the new State of Alaska would acquire title to the submerged lands underlying the monument's waters, including the

inland waters of Glacier Bay.

Alaska's exception to the Special Master's recommendation on count IV of Alaska's Amended Complaint is overruled.

## VI

For the foregoing reasons, we overrule each of Alaska's exceptions to the Special Master's recommendations. Alaska shall take title neither to the submerged lands underlying the pockets and enclaves of water at issue in counts I and II of its Amended Complaint nor to the submerged lands underlying the waters of Glacier Bay at issue in count IV. As to Count III of Alaska's Amended Complaint, the parties and the Special Master are in agreement that this Court should confirm the United States' proposed disclaimer of title. The proposed disclaimer is hereby accepted.

The parties are directed to prepare and submit to the Special Master an appropriate proposed decree for the Court's consideration. The Court retains jurisdiction to entertain such proceedings, enter such orders, and issue such writs as may become necessary or advisable to effect and supplement the forthcoming decree and the respective rights of the parties.

*It is so ordered.*



### Historic Waters of Alexander Archipelago

Graphic depiction of closing lines drawn by the United States at the 1903 Boundary Tribunal to mark the seaward limits of the inland waters of the Archipelago. *See 5 Proceedings of the Alaskan Boundary Tribunal,* S. Doc. No. 162, 58th Congress, 2d Session (1903-04), Pt. I, Argument of the United States, pp. 15-16; *id.* Vol. 4, Pt. I, Countercase of the United States, pp. 31-32.

Territorial sea (3 nautical miles) and inland waters

"Pockets and enclaves" more than 3 nautical miles from the shoreline of the coast and of any islands comprising the Alexander Archipelago and behind the 1903 Alaska Boundary Tribunal closing lines.

Territorial sea extending 3 nautical miles seaward from the United States' 1903 Alaska Boundary Tribunal closing lines and more than 3 nautical miles from any point on the mainland or any of the islands.

• Community or Settlement

This map is a graphic depiction only and is not intended as a legal description.

ALASKA
Area of Map

Haines

Juneau

Hoonah

Sitka

Kake

Petersburg

Wrangell

Edna Bay

Hydaburg

Ketchikan

Metlakatla

# APPENDIX B TO OPINION OF THE COURT
## GRAPHIC DEPICTION OF CLAIMED JURIDICAL BAYS



**JURIDICAL BAYS**

**NORTH SOUTHEAST**

**SOUTH SOUTHEAST**
The area is depicted as one bay for illustrative purposes. It may comprise more than one bay.

**Islands within the indentation or creating more than one mouth under Convention Article 7(3).**

Illustration of approximate juridical bay closing lines or baselines. Due to limitations of scale, such lines that measure less than one nautical mile are not depicted.

The smaller juridical bays, Sitka Sound and Cordova Bay are labeled but not otherwise highlighted in this graphic. Closing lines or baselines for the smaller juridical bays are not depicted.

This map is a graphic depiction only and is not intended as a legal description.

CANADA

Sitka Sound

Kuiu Is.

Kupreanof Is.

Mitor Is.

Cordova Bay

N

This graphic prepared by the Department of Natural Resources, Division of Mining, Land and Water, Technical & Data Management Section.

ALASKA

Area of Map

On this map, which was appended to Alaska's Amended Complaint, Alaska's claimed juridical bays are labeled as "North Southeast" and "South Southeast." Alaska now refers to them as "North Bay" and "South Bay" respectively. Exceptions and Brief for Plaintiff Alaska 37, n. 24.

# APPENDIX C TO OPINION OF THE COURT
## CHART OF GLACIER BAY NATIONAL MONUMENT



The thick red line shows the initial boundaries of Glacier Bay National Monument as established in the 1925 Proclamation. The thin red line shows the expanded boundaries of Glacier Bay National Monument as established in the 1939 Proclamation. Report 227-228.

# APPENDIX D TO OPINION OF THE COURT
## OFFICIAL MAP OF GLACIER BAY NATIONAL PARK AND PRESERVE



Published by the National Park Service, United States Department of the Interior.

# SUPREME COURT OF THE UNITED STATES

No. 128 Orig.

## STATE OF ALASKA, PLAINTIFF *v.* UNITED STATES OF AMERICA

ON BILL OF COMPLAINT

[June 6, 2005]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, concurring in part and dissenting in part.

I join all of the Court's opinion, except for Part V and the related portions of Part VI. I do not agree with the conclusion that the United States expressly retained title to submerged lands within Glacier Bay National Monument (Monument) at the time of Alaskan statehood.

The Court holds that the United States has rebutted the "strong presumption" that submerged lands passed to Alaska when it became a State. *Ante,* at 24, 34. That presumption inheres in the equal-footing doctrine, but is given particular strength and specificity in this case by §6(m) of the Alaska Statehood Act, 72 Stat. 343, which incorporated the Submerged Lands Act of 1953, including the confirmation that a State owns all "lands beneath navigable waters within [its] boundaries" unless (as relevant here) they were "*expressly* retained by or ceded to the United States when the State entered the Union," 43 U. S. C. §§1311(a), 1313(a) (emphasis added). The Court acknowledges that state title to submerged lands cannot be defeated ""unless the intention was definitely declared or otherwise made very plain."" *Ante,* at 24 (quoting *United States* v. *Alaska,* 521 U. S. 1, 34 (1997) *(Alaska (Arctic Coast))* (in turn quoting *United States* v. *Holt State Bank,* 270 U. S. 49, 55 (1926))). Though the Court makes a

dictal feint toward the Antiquities Act of 1906, *ante,* at 27–28, its holding relies on only a single proviso to §6(e) of the Alaska Statehood Act, *ante,* at 28–34.

That proviso seems to me anything but a "'very plain'" or "clear" retention of the Monument's submerged lands. *Alaska (Arctic Coast), supra,* at 34, 57. Indeed, the Court's own evaluation of the parties' textual arguments is candidly lukewarm toward the United States' position. Alaska's doomed construction of the proviso is deemed to be "neither necessary nor preferred," *ante,* at 31—not exactly a death knell when Alaska's *opponent* is subject to the clear-statement requirement. The Court applauds the United States' construction—the victorious, allegedly "clear" one—just for being "not . . . illogical," and admits that that construction means the statute was not written in "the usual style." *Ibid.*

The statutory text fully justifies this lack of exuberance. Section 5 of the Alaska Statehood Act established a general rule that "the United States shall retain title to all property . . . to which it has title . . . ." 72 Stat. 340. Section 6(m), by incorporating the Submerged Lands Act, generally excepted submerged lands from that rule. *Id.,* at 343. Another exception to the rule of U. S. retention was §6(e), which consisted of two relevant parts: the main clause, which required the "transfe[r] and conve[yance] to the State of Alaska" of "[a]ll real and personal property of the United States . . . specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska, under [certain statutory provisions]," *id.,* at 340; and the proviso, which said "[t]hat such transfer shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife," *id.,* at 341. The short of the matter is that if the proviso created only an exception from the preceding main clause, it did not reserve Glacier Bay (which was not covered by the main clause) for the United States; whereas if it was an

independent and free-standing reservation, it did.

The Court unconvincingly attempts to sever the proviso from its statutory text and context. It is true enough that by accumulation of sloppy usage a proviso need not, simply by reason of its introductory words ("provided that"), always be taken as a limitation only upon the preceding clause. *Ante,* at 31. But the Court fatally fails to cope with the actual text of this particular proviso. It claims, *ibid.,* that §6(e) moves from a specific main clause ("all real and personal property" under three statutes) to a general proviso ("lands withdrawn . . . as refuges"). But "lands" is not inherently more general than "real . . . property" and there is no reason whatever why the qualified former ("lands withdrawn . . . as refuges") cannot be a subset of the qualified latter ("real . . . property" under three statutes). Moreover, the Court disregards obvious clues to the relationship between these two parts of §6(e). It makes no attempt to identify the antecedent for the proviso's reference to "*such* transfer" (emphasis added). As it happens, the main clause of §6(e) contains the *only* mention of a "transfe[r]" in the Statehood Act that precedes the proviso,[1] making it the only logical antecedent. Thus, the word "such" indicates the natural, structural tie between §6(e)'s main clause and its proviso, making it quite clear that the proviso does not reserve to the United States *all* "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife," but rather only the lands of that description *covered by the preceding main clause.* Moreover, the proviso is phrased as a carve-out ("such transfer shall not include lands") rather than a free-standing rule (*e.g.,* "no transfer shall include lands" or "lands shall not be transferred"). In

---

[1] The only other mention of a "transfe[r]" in §6 appeared in subsection (k), which "confirmed and transferred" all grants previously made to the Territory of Alaska. 72 Stat. 343.

sum, the text amply supports Alaska's claim that the proviso operates as an exception to the main clause, and not the Court's conclusion that it is "an independent and general rule uncoupled from [that] clause," *ante,* at 34.

The Court also contends that its 1997 decision in *Alaska (Arctic Coast)* "foreclose[s]" Alaska's argument that the proviso operates as an exception to the main clause of §6(e). *Ante,* at 32. That conclusion follows from neither the holding of *Alaska (Arctic Coast)* nor any reasonable extension of its underlying rationale. As the Court acknowledges, *ante,* at 33, *"Alaska (Arctic Coast)* did not directly address the relationship between the initial clause and the proviso in §6(e)." It quoted them as if they were a single, unitary rule, 521 U. S., at 55, and, as the United States concedes, the Court "assum[ed] with no briefing," Tr. of Oral Arg. 34, that the refuge at issue fell within the scope of the main clause of §6(e). Given that assumption, the case does not stand for the proposition that the proviso is a free-standing provision; a proviso limited to the main clause would have the same effect. Or to put the point differently: *Alaska (Arctic Coast)* holds that what the proviso takes out of §6(e) it *also* takes out of §6(m). In the present case, however, it is undisputed that Glacier Bay is not *within* §6(e), and so is not *removed* from §6(e) by the proviso. Nothing in *Alaska (Arctic Coast)* suggests that the proviso alone operated "affirmatively and independently," *ante,* at 33, to trump §6(m). The Court is thus knocking down a straw man when it says that, if the proviso can trump §6(m), it would make "little sense" to cabin it with the main clause of §6(e), *ibid.* It was not the proviso that trumped §6(m), but the proviso's removal of land from the exception of §6(e). There is no such removal here.

The only part of the Court's opinion on Glacier Bay that displays genuine enthusiasm is its Ursine Rhapsody, which implies that federal ownership of submerged lands

is critical to ensuring that brown bears will not be shot
from the decks of pleasure yachts during their "distress-
ing[ly] frequen[t]" swims to islands where they feast on
seabirds and seabird eggs.[2] *Ante,* at 23. Surely this is
irrelevant to interpretation of the Alaska Statehood Act,
unless there is some principle of construction that texts
say what the Supreme Court thinks they ought to have
said. But besides being irrelevant, it is not even true.
Many (though perhaps not all) means of fulfilling the
Monument's purposes could be achieved without federal
ownership of the submerged lands within the Monument.
If title to submerged lands passed to Alaska, the Federal
Government would still retain significant authority to
regulate activities in the waters of Glacier Bay by virtue of
its dominant navigational servitude, other aspects of the
Commerce Clause, and even the treaty power.[3] See, *e.g.*,
43 U. S. C. §1314(a) (under the Submerged Lands Act, the
United States retains "powers of regulation and control of
. . . navigable waters for the constitutional purposes of

————————

[2] It is presumptively true that the seabirds consider these visits dis-
tressingly frequent, and demonstrably true that the brown bears do
not. It is unclear why this Court should take sides in the controversy.

[3] The United States presented evidence that, even before the Monu-
ment was established, some scientists had studied the bottom of Glacier
Bay and its relationship with the glaciers by taking soundings of the
water's depth. Memorandum in Support of Motion of the United States
for Partial Summary Judgment on Count IV of the Amended Complaint
13. Similar but more sophisticated studies, involving acoustic mapping
and sonar imaging of gouges in the floor of the bay, are conducted
today. Declaration of Tomie Patrick Lee 93–94, Exhibits to Reply of
United States in Support of Motion for Partial Summary Judgment on
Count IV of Amended Complaint, Tab No. 8 (Exh. U. S. IV–8). Alaska's
ownership of submerged lands should not hinder such studies, gener-
ally conducted from vessels on the water's surface. But the United
States also noted that other, newer means of scientific study—such as
withdrawing core samples from submerged lands and installing listen-
ing devices on the surface of submerged lands—would require Alaska's
cooperation. Tr. of Oral Arg. 40.

commerce [and] navigation"); *United States* v. *Morrison,*
529 U. S. 598, 609 (2000) (Congress may "regulate the use
of the channels of interstate commerce" and "protect the
instrumentalities of interstate commerce, or persons or
things in interstate commerce" (internal quotation marks
omitted)); *United States* v. *Alaska,* 503 U. S. 569, 577–583
(1992) (the Secretary of the Army may consider effects
upon recreation, fish and wildlife, natural resources, and
other public interests when refusing to permit structures
or discharges in navigable waters that have "no effect on
navigation"); *United States* v. *California,* 436 U. S. 32, 41,
and n. 18 (1978) (noting that the United States retained
"its navigational servitude" even when California took the
"proprietary and administrative interests" in submerged
lands surrounding islands in a national monument); *Doug-
las* v. *Seacoast Products, Inc.,* 431 U. S. 265, 284–287
(1977) (finding state regulation of commercial fishing
partially pre-empted by federal statute); Letter from W. C.
Henderson, Acting Chief, Bureau of Biological Survey,
Dept. of Agriculture, to Stephen T. Mather, Director,
National Park Service (Nov. 4, 1926), Alaska Exh. AK–405
(noting that a colony of eider ducks in and near the
Monument was "protected at all times by the Migratory
Bird Treaty Act and Regulations thereunder"). It is thus
unsurprising that States own submerged lands in other
federal water parks, such as the California Coastal Na-
tional Monument and the Boundary Waters Canoe Area in
Minnesota. See *California, supra,* at 37; Brief for Na-
tional Parks Conservation Association as *Amicus Curiae*
30.

I would probably find for Alaska on the Glacier Bay
issue even if the United States did not have to overcome
the obstacle of "very plain" retention. With the addition of
that well established requirement, the case is not even
close. Because neither text, nor context, nor precedent
compels the conclusion that the Alaska Statehood Act

expressly retained the Monument's submerged lands for the United States, I cannot agree with the Court's conclusion that the United States deserves summary judgment on count IV of Alaska's amended complaint.