**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA, on its
own behalf and as trustee on
behalf of the Lummi Nation,
              *Plaintiff-Appellee,*

              v.

KEITH E. MILNER,
                      *Defendant,*

              and

BRENT C. NICHOLSON; MARY K.
NICHOLSON,
              *Defendants-Appellants,*

              v.

LUMMI NATION,
        *Plaintiff-intervener-Appellee.*

No. 05-35802

D.C. No.
CV-01-00809-RBL

14457

UNITED STATES OF AMERICA, on its
own behalf and as trustee on
behalf of the Lummi Nation,
          *Plaintiff-Appellee,*

              v.

KEITH E. MILNER,
          *Defendant-Appellant,*

SHIRLEY A. MILNER; MARY D.
SHARP; IAN C. BENNETT; MARCIA
A. BOYD,
          *Defendants-Appellants,*
              and

BRENT C. NICHOLSON; MARY K.
NICHOLSON,
          *Defendants,*

              v.

LUMMI NATION,
          *Plaintiff-intervener.*

No. 05-36126

D.C. No.
CV-01-00809-RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued March 13, 2008
Submitted October 9, 2009
Seattle, Washington

Filed October 9, 2009

Before: Betty B. Fletcher, Richard A. Paez and
Richard C. Tallman,* Circuit Judges.

Opinion by Judge B. Fletcher

---

*Judge Tallman was drawn to replace Judge William W. Schwarzer, Senior United States District Judge for the Northern District of California, and has read the briefs, reviewed the record, and listened to a recording of oral arguments.

## COUNSEL

Richard M. Stephens, Groen Stephens & Klinge LLP, Bellevue, Washington, for the defendants-appellants.

Brian Kipnis, Office of the United States Attorney, Seattle, Washington, for the plaintiff-appellee.

Harry L. Johnsen, Raas, Johnsen & Stuen, P.S., Bellingham, Washington, for the plaintiff-intervenor-appellee.

Edgar B. Washburn, Morrison & Foerster LLP, San Francisco, California, for Amicus Building Industry Legal Defense Foundation.

John Briscoe, Briscoe Ivester & Bazel LLP, San Francisco, California, for Amicus Bay Planning Coalition.

## OPINION

B. FLETCHER, Circuit Judge:

In this appeal we decide whether a group of waterfront homeowners are liable for common law trespass and violations of the Rivers and Harbors Appropriation Act of 1899

(RHA), 33 U.S.C. § 403, and the Clean Water Act (CWA), 33 U.S.C. § 1311, because the ambulatory tideland property boundary has come to intersect shore defense structures the homeowners have erected. In a series of summary judgment rulings and after a bench trial, the district court found against the homeowners and ordered them to remove violating structures and to pay a $1500 civil penalty. We affirm in part and reverse in part.

# I.

In 1855, the United States executed the Treaty of Point Elliott with several Indian tribes, thereby acquiring a vast swath of what is now western Washington.[1] Treaty Between the United States and the Dwámish, Suquámish, and Other Allied and Subordinate Tribes of Indians in Washington Territory, Jan. 22, 1855, 12 Stat. 927 (1859) (the "Treaty of Point Elliott" or the "Treaty"). Under the terms of the Treaty, the tribes were relegated to certain reserved areas, including "the island called Chah-choo-sen," on which the Lummi Indian Reservation was created for the plaintiff-intervenor, the Lummi Nation. *Id.* at 928. Although the Lummi initially occupied only the island, by an executive order, President Grant in 1873 expanded the reservation to encompass portions of the mainland, including Sandy Point, a sandy spit, all in what is now Whatcom County, Washington. Exec. Order (Nov. 22, 1873), *reprinted in* 1 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 917 (1904), *available at* http://digital.library.okstate.edu/kappler/Vol1/ Images/v1p0917.jpg. Importantly, the order extended the reservation boundaries to "the low-water mark on the shore of the Gulf of Georgia."[2] *Id.* In other

---

[1] The Treaty of Point Elliott is one of a series of treaties negotiated by Territorial Governor Isaac Stevens with various Pacific Northwest Indian tribes in the mid-1800s. *See generally Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661-62 (1979); *Nez Perce Tribe v. Idaho Power Co.*, 847 F. Supp. 791, 805-06 (D. Idaho 1994).

[2] The "Gulf of Georgia" is now known as the Strait of Georgia.

words, President Grant explicitly expanded the reservation to include the tidelands of the relevant area. *United States v. Stotts*, 49 F.2d 619, 619, 621 (W.D. Wash. 1930).

As allowed under President Grant's executive order, the uplands were divided into lots and patented by members of the tribe. Defendants-appellants Keith and Shirley Milner (the "Milners"), Mary Sharp, Brent and Mary Nicholson (the "Nicholsons"), and Ian Bennett and Marcia Boyd ("Bennett/Boyd") (collectively, the "Homeowners") are the successors in interest to some of the parcels derived from these original patents. The Homeowners' parcels all adjoin tidelands on the Strait of Georgia.

Unlike the Homeowners' properties, the tidelands within the Lummi Reservation have otherwise never been alienated. Plaintiff-appellee the United States claims that it continuously has held the tidelands in trust for the Lummi Nation, pursuant to President Grant's executive order. Not surprisingly, then, it is at the boundary between the tidelands and the uplands that the present dispute finds its locus.

Although each property is slightly different, the Homeowners or their predecessors erected various "shore defense structures" to limit erosion and storm damage to their properties. The structures generally include "rip rap," large boulders used to dissipate the force of incoming waves, and bulkheads placed landward of the rip rap. Between 1963 and 1988, a homeowners' organization (the "Organization") had leased the tidelands from the Lummi Nation, giving waterfront property owners the right to erect shore defense structures on the tidelands; however, once the lease expired, both the Organization and the individual Homeowners declined to renew the lease.

Under federal law, the upper boundary of any tidelands is the mean high water (MHW) line, which is determined by projecting onto the shore the average of all high tides over a

period of 18.6 years. *Borax Consol. Ltd. v. City of Los Angeles*, 296 U.S. 10, 26-27 (1935). Over time, the Sandy Point shoreline has eroded significantly, so that as of January 2002, the date of the most recent survey in the record, some of the Homeowners' shore defense structures sat seaward of the MHW line and within the Lummi tidelands.[3] Given the expiration of the lease, the Homeowners do not have permission from the United States or the Lummi Nation to maintain structures on the tidelands, and they also lack permits to maintain structures in navigable waters of the United States or to discharge fill material into the waters of the United States.

The United States Army Corps of Engineers, and later the United States Attorney for the Western District of Washington, sent letters to the Homeowners demanding removal of the structures or alternatively that the Homeowners enter into agreements to lease the tidelands. When the Homeowners did not remove the structures, the United States filed virtually identical complaints against the separate Homeowners, alleging three causes of action: (1) trespass; (2) violation of § 10 of the Rivers and Harbors Appropriation Act of 1899 (RHA), 33 U.S.C. § 403; and (3) violation of § 301(a) of the Clean Water Act (CWA), 33 U.S.C. § 1311(a).[4] The Lummi Nation intervened in the consolidated action to assert its interest as the beneficial owner of the tidelands.

In a series of partial summary judgment rulings, District Judge Rothstein held that (1) the tidelands were owned by the United States, not the state of Washington; (2) the erosion of the Homeowners' property was not caused by an avulsive event inundating the uplands;[5] and (3) the tideland boundary

---

[3]Further complicating matters is the fact that the extent of the shore changes seasonally, though mean high water stays relatively constant.

[4]Although the United States originally sued six landowners, the government and the Lummi Nation reached a settlement with one landowner and entered into a consent decree with another.

[5]Under the doctrine of avulsion, a sudden and abrupt change in the shoreline—an avulsive event—does not alter the boundary line. *New Jer-*

line was ambulatory and was not arrested by the Homeowners' shore defense structures, so that it lay where the MHW line would be located but for the Homeowners' structures. Judge Rothstein then ruled on summary judgment that the Homeowners were liable for trespass and violation of the RHA, and that the Nicholsons had violated the CWA. Although the United States had sued the other Homeowners for violation of the CWA, it later dismissed those claims against all but the Nicholsons.

After finding liability, Judge Rothstein imposed an injunction under the RHA ordering the Homeowners to remove any shore defense structures located seaward of the MHW line. District Judge Leighton subsequently conducted a bench trial to determine what penalties to impose on the Nicholsons for the CWA violation. He imposed a $1500 fine—far less than what the government sought—and ordered them to remove rip rap below a certain point. Additionally, Judge Leighton heard the Milners' and Bennett/Boyd's motion for attorneys' fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, which he denied.

The Homeowners timely appealed, challenging the summary judgment rulings on the trespass, RHA, and CWA claims, as well as the injunctive relief imposed by the district court. The Homeowners also argue that the district court erred in denying the EAJA motion. We address these arguments in turn.

## II.

The district court had jurisdiction over the trespass claims under 28 U.S.C. § 1345, the RHA claims under 28 U.S.C.

---

*sey v. New York*, 523 U.S. 767, 784 (1998); *California ex rel. State Lands Comm'n v. United States*, 805 F.2d 857, 864 (9th Cir. 1986). The Homeowners do not appeal the district court's ruling that the doctrine of avulsion does not apply.

§§ 1331, 1345 and 33 U.S.C. § 406, and the CWA claims under 28 U.S.C. §§ 1331 and 1345. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review the district court's grant of summary judgment de novo. *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). We review a district court's grant of injunctive relief for abuse of discretion and will reverse if the district court based its decision on an erroneous legal standard or a clearly erroneous finding of fact. *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004). The decision whether to award fees under the EAJA also is reviewed for abuse of discretion. *United States v. Marolf*, 277 F.3d 1156, 1160 (9th Cir. 2002).

## III.

### A.

Federal common law governs an action for trespass on Indian lands. *United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994); *see also Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226, 235-36 (1985). That law generally comports with the Restatement of Torts, and in any event, Washington law conforms to the Restatement definition of trespass.[6] *See*

---

[6]In some instances, "[c]ontroversies governed by federal law do not inevitably require resort to uniform federal rules," and it may be appropriate to borrow from state law for the rule of decision. *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 283 (1982). For example, in *Wilson v. Omaha Indian Tribe*, the Supreme Court held that although federal law determined the question of ownership of land continuously held by the United States for an Indian tribe, state law could be borrowed to provide the applicable rules of avulsion and accretion. 442 U.S. 653, 670-71, 673-74 (1979). While it is clear that the federal common law of trespass applies here, it is less clear whether the application of the common enemy doctrine, discussed below, should be decided based on a uniform federal common law or borrowed Washington state law, which

*United States v. West*, 232 F.2d 694, 699 (9th Cir. 1956) (citing Arizona case law and the Restatement (First) of Torts to define trespass); *Edwardsen v. Morton*, 369 F. Supp. 1359, 1371 (D.D.C. 1973) (applying Restatement (Second) of Torts to federal trespass action); *United States v. Osterlund*, 505 F. Supp. 165, 167 (D.C. Colo. 1981) (same); *cf. Bradley v. Am. Smelting & Ref. Co.*, 709 P.2d 782, 785 (Wash. 1985) (quoting Restatement (Second) of Torts definition of trespass). Under the Restatement, a person is liable for trespass "if he intentionally . . . causes a thing [to enter land in the possession of another], . . . [or] fails to remove from the land a thing which he is under a duty to remove." Restatement (Second) of Torts § 158 (2009).

The district court found it uncontested that portions of the Homeowners' shore defense structures were seaward of the MHW line and therefore in Lummi tidelands. Nevertheless, the Homeowners make three arguments that they cannot be liable for trespass. First, they argue that Washington state, not the United States, owns the tidelands; therefore, the United States cannot properly assert an action for trespass against them. Second, they contend that because their structures were lawfully built landward of the MHW line—that is, on the Homeowners' property—they cannot be liable for trespass, despite the movement of the tideland boundary. Finally, they argue that the elements of intent and causation were not satisfied. We conclude that none of these arguments is correct.

---

holds that the doctrine does not apply to sea water. *See Grundy v. Thurston County*, 117 P.3d 1089, 1094 (Wash. 2005). We note that it would be anomalous for the *Grundy* decision to apply to other coastal property owners in Washington, yet not to this small group of homeowners. Nevertheless, we need not decide the issue, because we conclude that the common enemy doctrine is inapplicable regardless of whether *Grundy* provides the federal rule of decision.

**1.**

**[1]** The Homeowners' ownership argument turns on the effect of President Grant's executive order and its force under the "equal footing" doctrine. To put newly admitted states on an "equal footing" with the original states, the doctrine creates a strong presumption that newly admitted states acquire title to lands under navigable waters upon their admission to statehood. *Idaho v. United States*, 533 U.S. 262, 272-73 (2001). The presumption is rebutted (1) if such lands have been reserved by the United States, and (2) if Congress recognizes the reservation in a way that demonstrates an intent to rebut the presumption. *Id.* at 273. According to the Homeowners, because President Grant's executive order could not permanently reserve the tidelands for the Lummi, under the equal footing doctrine, title passed to the state of Washington when it became a state.[7]

**[2]** Prior quiet title actions make clear that President Grant's executive order was sufficient to prevent ownership from passing to Washington. In *United States v. Romaine*, the

---

[7]The United States argues that the Homeowners cannot assert Washington state's title in the tidelands because in a trespass action "[t]itle in a third person may not be alleged by a defendant who is not in privity of title with the third person," and the Homeowners do not claim to be in privity with the state. 75 Am. Jur. 2d Trespass § 62 (2009). However, this applies where the plaintiff is the one in possession and, in moving for partial summary judgment on the issue of ownership, the United States did not present evidence showing that it or the Lummi Nation was currently in possession of the tidelands. *See Thomsen v. State*, 422 P.2d 824, 827 (Wash. 1966) ("The presumption of the law that the person who has the possession has the property may not be rebutted by evidence that the property was in a third person, when offered as a defense by one who claims no title and was a wrongdoer.").

The United States' issue preclusion argument is similarly without merit, since the prior cases that the government relies on do not involve the Homeowners and the Homeowners are not subject to the binding effect of the prior judgments. *See Taylor v. Sturgell*, 128 S. Ct. 2161, 2172-73 (2008) (describing the six circumstances in which a nonparty can be bound by a prior decision).

United States sought to quiet title against individuals who had bought Lummi tidelands from the state of Washington. 255 F. 253, 253 (9th Cir. 1919). This court held the president's executive order to be decisive and rejected an argument that the reservation extended only to the high-water mark. *Id.* at 259-60. *Romaine* noted that when Washington was admitted as a state, it disclaimed any right and title

> to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.

*Id.* at 260 (quoting Act of Feb. 22, 1889, ch. 180, § 4, 25 Stat. 676, 677). *United States v. Stotts* similarly involved a suit by the United States to quiet title in Lummi tidelands purchased from the state. 49 F.2d 619, 619 (W.D. Wash. 1930). Distinguishing *United States v. Holt State Bank*, 270 U.S. 49 (1926), one of the earliest cases establishing the contours of the equal footing doctrine, *Stotts* held that unlike in *Holt* the Lummi had a specific declaration reserving the tidelands for them. *Stotts*, 49 F.2d at 621. *Stotts* also noted that the Treaty of Point Elliott clearly gave the Lummi and other tribes the right to fish in their "usual and accustomed grounds and stations" and that possession of the tidelands was "a necessary perquisite to the enjoyment of fishing." *Id.* at 620-21. In more recent litigation, we again gave effect to the 1873 executive order as definitively establishing the boundaries of the Lummi reservation, including the order's reservation of tidelands. *United States v. Washington*, 969 F.2d 752, 755-56 (9th Cir. 1992). Notably, in *Washington*, the state took the position that the Lummi reservation extends to the low-tide line and did not claim the tidelands. *Id.* at 753. In this lawsuit, the state has expressly declined to claim ownership of the tidelands and to intervene.

**[3]** We have remarked before that *stare decisis* "applies with special force to decisions affecting title to land," given the special reliance that such decisions command. *Confederated Salish & Kootenai Tribes v. Namen*, 665 F.2d 951, 960 (9th Cir. 1982); *see also Minnesota Co. v. Nat'l Co.*, 70 U.S. 332, 334 (1865) ("Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change."); *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court."). The Lummi and homeowners on Sandy Point have long relied on the fact that the Lummi own the tidelands. Until 1988, Homeowners leased the tidelands from the Lummi, with both sides believing that the Lummi owned the tidelands. We see no reason, then, to overturn 90 years of precedent, especially when the supposed title holder has declined to claim ownership.

Additionally, evaluating the executive order against contemporary case law, we find it sufficient to rebut the presumption of the equal footing doctrine. As the Supreme Court has explained, "the two-step test of congressional intent is satisfied when an Executive reservation clearly includes submerged lands, and Congress recognizes the reservation in a way that demonstrates an intent to defeat state title." *Idaho*, 533 U.S. at 273 (citing *United States v. Alaska*, 521 U.S. 1, 41-46, 55-61 (1997) (*Alaska (Arctic Coast)*)). Although "disposals by the United States during the territorial period are not lightly to be inferred," *Holt State Bank*, 270 U.S. at 55, because the two-step test of congressional intent is met, the tidelands did not pass to Washington upon its admission to statehood.

**[4]** The first part of the test is easily met. Article VII of the Treaty of Point Elliott provides that "[t]he President may

hereafter, when in his opinion the interests of the Territory shall require and the welfare of the said Indians be promoted, remove them from either or all of the special reservations hereinbefore made to the said general reservation, or such other suitable place within said Territory as he may deem fit." 12 Stat. at 929. Thus, in ratifying the Treaty, Congress gave the President the discretionary power to alter the boundaries of the reservation;[8] he later exercised these powers by explicitly extending the reservation to the low-water mark, thereby including the tidelands. *Cf. Alaska v. United States*, 545 U.S. 75, 101-02 (2005) (*Alaska (Glacier Bay)*) (finding that executive proclamation reserving submerged lands as part of national monument met first prong of congressional intent test).

[5] When Congress admitted Washington to statehood, it was aware that the President's executive order added the tidelands to the reservation. *See Alaska (Arctic Coast)*, 521 U.S. at 45 (finding that the President's executive order "placed Congress on notice that the President had construed his reservation authority to extend to submerged lands and had exercised that authority to set aside uplands and submerged lands in the Reserve"). And while Congress admitted Washington on an equal footing, 25 Stat. at 679, it also recognized the validity of the executive order reservation by requiring Wash-

---

[8]Treaties and other agreements with Indians are liberally construed in favor of the Indians. *Choctaw Nation v. United States*, 318 U.S. 423, 431-32 (1943) ("Of course treaties are construed more liberally than private agreements[ ] . . . . Especially is this true in interpreting treaties and agreements with Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and 'in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people' " (citations omitted)). The President's power to "remove" the tribes from the specified reservations to "such other suitable place . . . as he may deem fit" therefore encompasses the power to expand the boundaries of the reservation, since the President has the discretion to deem an expanded reservation a suitable replacement for the current one and "remove" the tribes from the smaller reservation to the expanded one.

ington state to "forever disclaim all right and title . . . to all lands . . . owned or held by any Indian or Indian tribes." *Id.* at 677. This proviso was written more broadly than Congress's specific recognition of ownership over the National Petroleum Reserve in *Alaska (Arctic Coast)*, *see* 521 U.S. at 41-42, but a broad congressional statement can still be a clear expression of intent. In *Alaska (Glacier Bay)*, the Supreme Court held that an exception that prevented the transfer of "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife" to the state of Alaska was a sufficient indication of intent so as to defeat state title to submerged lands in the Glacier Bay National Monument. 545 U.S. at 105 (quoting the Alaska Statehood Act, Pub. L. No. 85-508, § 6(e), 72 Stat. 339, 341 (1958)). As in *Alaska (Glacier Bay)*, Congress made it abundantly clear here that Washington would not have title to the lands in question, thereby satisfying the second step of the congressional intent test.

**[6]** Historically, the Lummi and other Pacific Northwest tribes have depended heavily on fishing and digging for shellfish as a means of subsistence. *See Stotts*, 49 F.2d at 620-21; *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 665-67 (1979). President Grant's reservation of the tidelands thus served to promote the tribe's access to fishing and shellfish, and the welfare of the tribe more generally. Longstanding precedent has established that the tidelands were reserved for the Lummi, and both the tribe and others have relied on this understanding for years. But even were there no such precedent, the executive order reserving the tidelands was promulgated pursuant to congressional authority and subsequently recognized by Congress in a way that indicates a clear intent to prevent title from passing to the state of Washington. We therefore hold that the United States owns the tidelands and holds them in trust for the Lummi.

## 2.

The problem of riparian and littoral property boundaries is a recurring and difficult issue. These disputes can be especially complicated where the land borders tidal waters, because the waters fluctuate dramatically and because private title claims often have to be balanced against federal and state interests in the ownership and use of the submerged lands. At issue in the Homeowners' second challenge to the trespass claim are two competing common law principles. On the one hand, courts have long recognized that an owner of riparian or littoral property must accept that the property boundary is ambulatory, subject to gradual loss or gain depending on the whims of the sea.[9] *See, e.g.*, *County of St. Clair v. Lovingston*, 90 U.S. 46, 68-69 (1874). On the other hand, the common law also supports the owner's right to build structures upon the land to protect against erosion. *See, e.g.*, *Cass v. Dicks*, 44 P. 113, 114 (Wash. 1896) ("If a landowner whose lands are exposed to inroads of the sea[ ] . . . erects sea walls or dams for the protection of his land, and by so doing causes the tide, the current, or the waves to flow against the land of his neighbor . . . [he] is not responsible in damages to the latter, as he has done no wrong having acted in self-defense, and having a right to protect his land." (citation omitted)). In this case, the Homeowners' land has eroded away so dramatically that the ambulatory tideland boundary has reached and become fixed at their shore defense structures. While the Homeowners cannot be faulted for wanting to prevent their land from eroding away, we conclude that because both the upland and tideland owners have a vested right to gains from the ambulation of the boundary, the Homeowners cannot permanently fix the

---

[9]While the rights and duties of riparian landowners—those with land fronting a river or stream—can differ from those of littoral landowners—those with property fronting an ocean, sea, or lake—the rules often overlap and sometimes the distinction is elided altogether. *See, e.g.*, *Tusher v. Gabrielsen*, 80 Cal. Rptr. 2d 126, 146-47 (Ct. App. 1998); *Thies v. Howland*, 380 N.W.2d 463, 288 n.2 (Mich. 1985); *but see In re Opinions of the Justices*, 106 A. 865, 868-69 (Me. 1919) (stating that a riparian owner may lower a stream so long as the use is reasonable but that a littoral owner may not draw down a lake below the natural level).

property boundary, thereby depriving the Lummi of tidelands that they would otherwise gain.

**[7]** Under the common law, the boundary between the tidelands and the uplands is ambulatory; that is, it changes when the water body shifts course or changes in volume. *See Jefferis v. East Omaha Land Co.*, 134 U.S. 178, 189 (1890); *California ex rel. State Lands Comm'n v. United States*, 805 F.2d 857, 864 (9th Cir. 1986); *United States v. Boynton*, 53 F.2d 297, 298 (9th Cir. 1931). The uplands owner loses title in favor of the tideland owner—often the state—when land is lost to the sea by erosion or submergence. The converse of this proposition is that the littoral property owner gains when land is gradually added through accretion, the accumulation of deposits, or reliction, the exposure of previously submerged land. *See County of St. Clair*, 90 U.S. at 68-69; *Jefferis*, 134 U.S. at 189; 65 C.J.S. Navigable Waters § 95 (2009). These rules date back to Roman times, and have been noted in Blackstone's Commentaries and many other common law authorities and cases. *See County of St. Clair*, 90 U.S. 66-67 (citing *inter alia* the Institutes of Justinian, the Code Napoleon, and Blackstone's Commentaries); John M. Gould, A Treatise on the Law of Waters 306-08 (3d ed. 1900) ("Land formed by *alluvion*, or the gradual and imperceptible accretion from the water, and land gained by *reliction*, or the gradual and imperceptible recession of the water, belong to the owner of the contiguous land to which the addition is made. . . . Conversely land gradually encroached upon by navigable waters ceases to belong to the former owner."); 3 Emory Washburn, A Treatise on the American Law of Real Property 75 (6th ed. 1902) ("[T]he boundary line of an owner's land bordering upon the sea varies with the gradual increase or diminution of quantity by the addition of alluvion, or by the encroachments of the water upon the land, the line of the shore varying accordingly.").

**[8]** Importantly, the upland owner's right to accretions is a vested right and "rests in the law of nature." *County of St.*

*Clair*, 90 U.S. at 68. It is justified in large part because the upland owner's land is subject to erosion. As the Supreme Court stated in *County of St. Clair*,

> The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property. The title to the increment rests in the law of nature. It is the same with that of the owner of a tree to its fruits, and of the owner of flocks and herds to their natural increase. The right is a natural, not a civil one. The maxim 'qui sentit onus debet sentire commodum' ['he who enjoys the benefit ought also to bear the burdens'] lies at its foundation. The owner takes the chances of injury and of benefit arising from the situation of the property. If there be a gradual loss, he must bear it; if, a gradual gain, it is his.

*Id.* at 68-69; *see also Nebraska v. Iowa*, 143 U.S. 359, 360-61 (1892) ("Every proprietor whose land is thus bounded [by water] is subject to loss by the same means which may add to his territory; and, as he is without remedy for his loss in this way, he cannot be held accountable for his gain." (quoting *New Orleans v. United States*, 35 U.S. (10 Pet.) 662, 717 (1836))); *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 326 (1973) ("Since a riparian owner is subject to losing land by erosion beyond his control, he should benefit from any addition to his lands by the accretions thereto which are equally beyond his control."), *overruled on other grounds by Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977).

**[9]** By this logic, both the tideland owner and the upland owner have a right to an ambulatory boundary, and each has a vested right in the potential gains that accrue from the movement of the boundary line. The relationship between the tideland and upland owners is reciprocal: any loss experienced by one is a gain made by the other, and it would be

inherently unfair to the tideland owner to privilege the forces of accretion over those of erosion. Indeed, the fairness rationale underlying courts' adoption of the rule of accretion assumes that uplands already are subject to erosion for which the owner otherwise has no remedy.

Some courts have justified the rule of accretion by noting that it is in the interest of the community that land have an owner and be put to "productive use." *See Bd. of Trustees of the Internal Improvement Fund v. Medeira Beach Nominee, Inc.*, 272 So. 2d 209, 213 (Fla. Dist. Ct. App. 1973); *Brainard v. State*, 12 S.W.3d 6, 18 (Tex. 1999). While this could be seen as supporting the notion that dry uplands should be valued more than tidelands, we decline to hold that the use of uplands is inherently more valuable than the use to which tidelands can be put. As was already noted, the tidelands have played an important role in the Lummi's traditional way of life, and in most other areas, the tidelands are held by the state in trust for the public. *See Illinois Central R.R. Co. v. Illinois*, 146 U.S. 387, 436-37 (1892). These interests are substantial, and the uses they represent are not obviously less "productive." *See Shively v. Bowlby*, 152 U.S. 1, 57 (1894) ("[Lands under tide waters] are of great value to the public for the purposes of commerce, navigation, and fishery. Their improvement by individuals, when permitted, is incidental or subordinate to the public use and right."). Thus, both the Lummi and the Homeowners must accept that the ambulatory boundary is "an inherent and essential attribute of the original property," *County of St. Clair*, 90 U.S. at 68, and that both the tidelands and the uplands are subject to diminishment and expansion based on the forces of the sea.

[10] The Homeowners concede that the tideland boundary is ambulatory, but only to a point. According to the Homeowners, once the MHW line intersects the face of their defense structures, the boundary becomes fixed and remains so unless the tide line overtops the structures or recedes. The Homeowners rightly note that the common law permits them

to erect shore defense structures on their property to prevent erosion. They contend that they lawfully did just that, building landward of the MHW line, and cannot be liable for the movement of the tideland boundary. In particular, the Homeowners draw support for their position from the common enemy doctrine, which provides that "[a] man may raise an embankment on his own property to prevent the encroachments of the sea, although the fact of his doing so may be to cause the water to beat with violence against the adjoining lands, thereby rendering it necessary for the adjoining landowner to enlarge or strengthen his defenses." *Revell v. People*, 52 N.E. 1052, 1059 (Ill. 1898) (quotation marks and citation omitted).

[11] Typically, the common enemy doctrine applies as a defense to nuisance or trespass actions where a property owner has caused surface waters—the "common enemy" of all landowners—to invade a neighbor's property.[10] *See, e.g.*, *Cass v. Dicks*, 44 P. 113, 114 (Wash. 1896) ("[S]urface water, caused by the falling of rain or the melting of snow, and that escaping from running streams and rivers, is regarded as an

---

[10]Many jurisdictions have dispensed with the doctrine altogether and instead apply a rule of reasonableness, under which "each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable." *Armstrong v. Francis Corp.*, 120 A.2d 4, 8 (N.J. 1956); *see, e.g.*, *Weinberg v. N. Alaska Dev. Corp.*, 384 P.2d 450, 452 (Alaska 1963); *Bunch v. Coachella Valley Water Dist.*, 935 P.2d 796, 801 (Cal. 1997); *Rodrigues v. State*, 472 P.2d 509, 516 (Haw. 1970); *see generally*, Wendy B. Davis, Reasonable Use Has Become the Common Enemy, 9 Alb. L. Envtl. Outlook J. 1, 9-10 (2004) (noting that 21 states have adopted the "reasonable use" rule). While Washington has retained the doctrine, it has modified the rule so that property owners must exercise due care by "acting in good faith and avoiding unnecessary damage to the property of others," *Currens v. Sleek*, 983 P.2d 626, 629-30 (Wash. 1999), and by making the rule inapplicable to sea water. *Grundy*, 117 P.3d at 1094. It is far from clear, then, that the common enemy rule, as advocated by the Homeowners, is even the dominant view.

outlaw and a common enemy, against which any one may defend himself, even though by doing so injury may result to others."). The doctrine therefore does not apply here. On the one hand, the injury complained of is not the diversion of water onto the tidelands; rather, it is the physical encroachment of the shore defense structures themselves. With the exception of *Revell*, which held that a waterfront property owner had no right to erect structures on submerged land owned by the state, 52 N.E. at 1060, all the cases cited by the Homeowners concern disputes over structures diverting waters onto a neighbor's land, not the maintenance of structures on the neighbor's land. *See Lamb v. Reclamation Dist. No. 108*, 14 P. 625, 626-27 (Cal. 1887); *Miller v. Lezerich*, 49 S.W.2d 404, 406 (Tex. 1932). On the other hand, the rule is inapposite because the water is not acting as a "common enemy" of the parties involved. The tide line is an inherent attribute of the properties at issue, since it dictates where the tidelands end and the uplands begin. That the boundary is ambulatory does not make it a common enemy, since any movement seaward or landward is to the benefit of one party and the detriment of the other. It is unfortunate that the boundary line increasingly has encroached on the Homeowners' property, but they cannot claim that the common enemy doctrine allows them to fix permanently the tideland boundary.

[12] The Homeowners have the right to build on their property and to erect structures to defend against erosion and storm damage, but all property owners are subject to limitations in how they use their property. The Homeowners cannot use their land in a way that would harm the Lummi's interest in the neighboring tidelands. Given that the Lummi have a vested right to the ambulatory boundary and to the tidelands they would gain if the boundary were allowed to ambulate, the Homeowners do not have the right to permanently fix the property boundary absent consent from the United States or the Lummi Nation. The Lummi similarly could not erect structures on the tidelands that would permanently fix the

boundary and prevent accretion benefitting the Homeowners. Although the shore defense structures may have been legal as they were initially erected, this is not a defense against the trespass action nor does it justify denying the Lummi land that would otherwise accrue to them.

**[13]** We emphasize that this does not mean property owners cannot erect shore defense structures on their property or take other action to prevent erosion. Nor does it mean that the Homeowners must necessarily remove their structures, if they can reach an agreement with the Lummi Nation and the United States that allows the structures to remain. Rather, we hold only that the Homeowners have no defense to a trespass action because they are seeking to protect against erosion.[11] Once the shore has eroded so dramatically that the property owner's shore defense structures fix the ambulatory boundary, the upland owner cannot expect to permanently maintain the boundary there without paying damages to the tideland owner or working out an agreement with the tideland owner. Homeowners on Sandy Point previously had leased the tidelands from the Lummi, and there is no reason the Homeowners could not similarly seek to negotiate a new agreement now.

---

[11]Amicus curiae Building Industry Legal Defense Foundation ("BILD") argues that such a rule will have dramatically harmful consequences, given the many coastal properties with shore defense structures. This over-estimates the reach of our opinion, however. Because of the equal footing doctrine and the Submerged Lands Act, 43 U.S.C. § 1311, the states hold title to most of the tidelands. Most disputes that arise between the states and littoral property owners over tideland boundaries and the use of tide-lands are ultimately a matter for state courts to adjudicate under state law. The states, of course, must consider the public interest—not just those of waterfront property owners—in deciding how to manage their tidelands, as they already have been doing. As with many property disputes, those between tideland holders and littoral property owners will not be easy to resolve and they may simply require the parties to compromise, even if that means not everyone is entirely satisfied with the results.

**3.**

It is undisputed that as of the 2002 survey, some of the Homeowners' shore defense structures sat seaward of the MHW line. The Homeowners nevertheless argue that they cannot be liable for trespass because they did not intend the structures to trespass and because the trespass was caused by the erosion of the shore and resulting movement of the boundary, not by the Homeowners.

**[14]** However, as the district court noted, to be liable for trespass, the Homeowners need not have intended the actual trespass. Rather, the intent requirement is satisfied because the government requested that the encroaching parts of the structures be removed, but the Homeowners failed to do so. *See New York State Energy Research & Dev. Auth. v. Nuclear Fuel Servs., Inc.*, 561 F. Supp. 954, 974 (W.D.N.Y. 1983) ("In the case of trespass through the continuing presence of chattels on another's land, the requisite intent does not arise until the duty to remove the chattels arises, which does not occur until a demand for removal has been made."); *see also* Restatement (Second) of Torts § 161; 75 Am. Jur. 2d Trespass § 19 (2009) ("A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing that the actor or a predecessor in legal interest has placed on the land and failed to remove."). And although the Homeowners did not cause the movement of the boundary line, they can still be liable for the structures even after the boundary moved across the structures. It is enough that the Homeowners caused the structures to be erected and that the structures subsequently rested on the tidelands. *See* Restatement (Second) of Torts § 161, cmts. b, e.

**[15]** Given that the United States, not Washington, holds title to the tidelands and that the Homeowners cannot permanently fix the tideland boundary, it quickly follows that the Homeowners are liable for trespass. The district court was

correct, then, in finding in favor of the United States and Lummi Nation as to the trespass claim.

**B.**

**[16]** Turning next to the RHA claim, there are three ways in which a defendant could violate § 10 of the RHA. The first clause of § 10 prohibits the creation of "any obstruction not affirmatively authorized by Congress[ ] to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403. Clauses two and three respectively make it unlawful to "build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army" or to "excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same." *Id.*

Under the RHA the navigable waters of the United States means "all places covered by the ebb and flow of the tide to the mean high water (MHW) mark in its unobstructed, natural state." *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 753 (9th Cir. 1978); *see also* 33 C.F.R. §§ 322.2(a), 329.4, 329.12(a)(2). Notably, courts have "consistently found [the RHA's] coverage to be broad," *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967); *see also Sanitary Dist. Co. of Chicago v. United States*, 266 U.S. 405, 429 (1925) (calling the RHA "a broad expression of policy in unmistakable terms"), and "read the [RHA] charitably in light of the purpose to be served." *United States v. Republic Steel Corp.*, 362 U.S. 482, 491 (1960).

The Homeowners concede that they do not have authorization to maintain structures in the navigable waters of the

United States. Given that at least some of their shore defense structures lie seaward of the MHW line, the issue on appeal is whether the district court properly ruled that the Homeowners had violated § 10 by not removing their shore defense structures from the tidelands.

[17] Although § 10 does not explicitly mention the maintenance of structures in navigable waters, in the sense of keeping structures in place, we have interpreted the RHA as making unlawful the failure to remove structures prohibited by § 10, even if they were previously legal. *See United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1167 (9th Cir. 2000) ("Gateway's assertion that the Corps cannot remove a lawfully erected structure is equally unavailing. . . . the RHA allows the United States to remove structures that were once erected lawfully but subsequently found to be obstructions."). This makes sense in light of the RHA's concern with insuring that navigable waterways remain free of obstruction, because even initially legal structures can subsequently interfere with navigation. *See, e.g.*, *United States v. New York Cent. R.R.*, 252 F. Supp. 508, 511 (D. Mass. 1965) (finding landward remnants of previously legal bridge an obstruction), *aff'd per curiam*, 358 F.2d 747 (1st Cir. 1966). The Homeowners' structures may have been legal as initially built, but because of the movement of the tidal boundary they now sit in navigable waters and are obstructions.[12]

[18] The Homeowners argue that *Alameda Gateway* is inapplicable, because it concerns the first clause of § 10, and, according to them, the shore defense structures do not interfere with navigation. However, structures violating clauses

---

[12]The Corps' regulations confirm that structures may be obstructions without regard to how the structures came to be in navigable waters. The Corps generally requires a permit "for structures and/or work in or affecting navigable waters," without reference to whether the structure is being initially erected in navigable waters or has already been sitting there. 33 C.F.R. § 322.3(a).

two or three are presumed to be obstructions under the first clause. *Alameda Gateway*, 213 F.3d at 1165; *Sierra Club v. Andrus*, 610 F.2d 581, 596 (9th Cir. 1979), *rev'd on other grounds sub nom. California v. Sierra Club*, 451 U.S. 287 (1981) (holding that there is no implied private right of action under § 10 and thus declining to reach the merits). That is, clauses two and three have been interpreted as "a legislative enumeration of specific obstructions to navigable capacity that require Corps authorization" to be legal, *Andrus*, 610 F.2d at 594, with the Corps having discretion to "determine what in the particular cases constitute[s] an unreasonable obstruction." *Id.* at 596 (quoting *Wisconsin v. Illinois*, 278 U.S. 367, 413 (1929)). There is no need, then, for the Corps or the courts to determine first that the Homeowners' structures obstruct navigable capacity, since the structures obviously qualify as a "breakwater, bulkhead, . . . or other structure" under clause two and modify the course, location, condition, and capacity of the Strait under clause three. 33 U.S.C. § 403. The Homeowners are therefore required to have Corps authorization; because they have maintained their structures in the tidelands without such authorization, they can be liable under the RHA.

BILD argues that under the RHA navigable waters do not extend to the MHW line in its "unobstructed, natural state," because *Leslie Salt* stated that this jurisdictional line "is dictated by the principle . . . that one who develops areas below the MHW line does so at his peril." 578 F.2d at 753. According to BILD, since the Homeowners claim they built above the MHW line, *Leslie Salt* is inapplicable. On the one hand, whether navigable waters reach the MHW in its unobstructed state or in its obstructed state is irrelevant here, because the Homeowners are liable either way. The topographic survey maps submitted by the government show that at least some rip rap from the shore defense structures sits below the MHW line, and that rip rap has not so obstructed the movement of the tide that it is prevented from flowing landward of this scattered rip rap. So even assuming an obstruction could pre-

vent the movement of the MHW line under the RHA, the Homeowners have still violated clause two of § 10.

On the other hand, this argument ignores the RHA's central concern, which is to insure that the nation's waterways remain navigable and free of obstruction. The nation's navigable waterways, of course, can change, and with it the Corps' jurisdiction. *See, e.g.*, *Swanson v. United States*, 789 F.2d 1368 (9th Cir. 1986) (finding Corps had jurisdiction over subsequently flooded area). Structures that were previously above the MHW line can become subject to Corps' regulation because the tide line has moved, and if those structures prevent the MHW line from achieving its unobstructed, natural state they can pose a serious risk to navigation. A structure should not be exempt from regulation because it so significantly displaces navigable waters that the waters are permanently penned in. Just as one who develops below the MHW line "does so at his peril," those who build too close to the MHW line also run the risk that their structures eventually may become obstructions and be subject to regulation by the Corps.[13]

**[19]** The Homeowners' structures additionally violate clause three of § 10, without regard to whether or not one considers the waters in their unobstructed state. In certain circumstances a structure or activity can still be a violation of clauses one or three of § 10 even if the structure or activity is not located in navigable waters. *See United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1298 (5th Cir. 1976). As the Fifth Circuit has put it, for the most part § 10 has "no locality assigned to its prohibitions." *Id.*

---

[13]As in *Leslie Salt*, we express no opinion as to whether or at what point the government may be estopped from asserting its jurisdiction because land has long ago been filled in, as was the case in *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 610-11 (3d Cir. 1974). *See* 578 F.2d at 753. There is no indication here that the United States excessively delayed its enforcement efforts.

It prohibits any obstruction to navigable capacity. There is no suggestion that an obstruction whose source is above [the MHW line] escapes prosecution. It prohibits the alteration or modification of the course, condition, location or capacity of a navigable water. There is not the slightest intimation that an alteration or modification whose source is above [the MHW line] is any less an alteration or modification. There is nothing in the language of the statute nor the logic of its implementation which creates this barrier beyond which the Corps is ubiquitously powerless. Indeed, such a limitation would thwart the design of the statute.

*Id.* at 1298-99; *see also* 33 C.F.R. § 322.3(a) ("Structures or work outside [the navigable waters of the United States] are subject to [§ 10] if these structures or work affect the course, location, or condition of the waterbody in such a manner as to impact on its navigable capacity."). Under clause three, even though the tide line does not extend past the Homeowners' shore defense structures because the Homeowners have successfully prevented the Strait from advancing landward, the structures "alter or modify the course, location, condition, or capacity of" the Strait, since the flow of the waters is limited by the structures. 33 U.S.C. § 403. The Homeowners are therefore liable on this alternative basis as well.

**[20]** Because the Homeowners have maintained at least part of their shore defense structures below the MHW line, and because the structures alter the course, location, condition, or capacity of the Strait, they are required to obtain Corps' authorization or face liability. Contrary to the Homeowners' claim, they need not have intended to violate the RHA; it is sufficient under *Alameda Gateway* that they intentionally erected structures that became obstructions. *See* 213 F.3d at 1167. The district court therefore appropriately found liability, and its imposition of an injunction under § 12 of the RHA, 33 U.S.C. § 406, was not an abuse of discretion, given the

standard for injunctions under § 12. *See United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 611 (3d Cir. 1974) ("No balancing of interest or need to show irreparable injury is required when an injunction is sought under § 12 to prevent erection or seek removal of an unlawful structure.").

## C.

[21] The CWA prohibits the discharge of any dredged or fill material into "navigable waters" unless authorized by the Corps. *See* 33 U.S.C. §§ 1311, 1344. However, the scope of the Corps' regulatory authority under the CWA and RHA is not the same, in part because the definition of "navigable waters" is broader under the CWA and encompasses all "waters of the United States." 33 U.S.C. § 1362(7); *Leslie Salt*, 578 F.2d at 754-55. Instead of using the MHW line, the Corps' regulations define its CWA jurisdiction over tidal waters by reference to the "high tide line," 33 C.F.R. § 328.4(b)(1), which, in turn, is defined as "the line of intersection of the land with the water's surface at the maximum height reached by a rising tide."[14] 33 C.F.R. § 328.3(d).

The district court found on summary judgment that the Nicholsons had violated the CWA, because, in the course of reconstructing their shore defense structures, they discharged fill material below where the high tide line would fall in its

---

[14]Locally, the policy of the Seattle District of the Corps has been to draw the high tide line at the mean higher high water (MHHW) line, which is calculated by averaging over 18.6 years the highest of the two high tides that occur in a day and projecting that line onto the shore. *Leslie Salt*, 878 F.2d at 746. Because the two daily Pacific coast tidal cycles can vary greatly in height, the difference between the MHHW line and the MHW line—the average of both high tides occurring in a day—can be relatively large on the west coast of the United States. *Id.* In fashioning a remedy for the CWA violation, Judge Leighton took the Corps' local enforcement policy into account, but, contrary to the government's position, this does not necessarily conflict with what Judge Rothstein found on summary judgment.

unobstructed, natural state without a permit. In so ruling, the district court again relied on the holding from *Leslie Salt* that "the MHW line is to be fixed in accordance with its natural, unobstructed state." 578 F.2d at 753. However, while *Leslie Salt* applied this rule to the definition of navigable waters under the RHA, it was more circumspect as to what the limits of navigable waters and the Corps' jurisdiction are under the CWA. The district court in *Leslie Salt* had held that navigable waters under the CWA extended to the MHHW line in its unobstructed, natural state. *Sierra Club v. Leslie Salt Co.*, 412 F. Supp. 1096, 1103 (N.D. Cal. 1976). But we declined to hold that the waters of the United States extended to all places the water would theoretically reach, partially out of concerns that such a ruling swept too broadly and unnecessarily included "fast land" or "improved solid upland." *See Leslie Salt*, 578 F.2d at 754. Since we could decide *Leslie Salt* by addressing only whether the particular waters in question were subject to regulation by the Corps, we did not address the ultimate question of what constitutes the outer limit of the Corps' CWA jurisdiction. *Id.* at 756.

**[22]** This case presents more squarely the question of how far the Corps' CWA jurisdiction extends. *Leslie Salt* addressed whether certain waters diked off from the San Francisco Bay constituted waters of the United States. 578 F.2d at 756. Here there is a question as to whether any water actually reaches the area at issue, and if not, whether it is still subject to regulation by the Corps. The parties in *Leslie Salt* agreed that the Corps' jurisdiction does not extend to property that was dry, solid upland as of the date of the passage of the CWA. *See id.* at 754. In the same vein, the Corps has stated that it does not intend to assert jurisdiction over lands that once were submerged but which have been transformed into dry land. *See* 42 Fed. Reg. 37128 (July 19, 1977). While we do not purport to decide the full extent of the Corps' CWA regulatory authority, we find this approach persuasive. Any discharge on fast land would not actually be in the waters of the United States, and it would be potentially unfair to occu-

pants of such land to hold them to the strictures of the CWA if the land has long been dry. Even if land has been maintained as dry through artificial means, if the activity does not reach or otherwise have an effect on the waters, excavating, filling and other work does not present the kind of threat the CWA is meant to regulate.

[23] This does not mean that fast land cannot subsequently become submerged by the waters of the United States. As the Corps' regulations acknowledge, gradual changes to the bed of a body of water will change the boundaries of the waters of the United States. 33 C.F.R. § 328.5. But if land was dry upland at the time the CWA was enacted, it will not be considered part of the waters of the United States unless the waters actually overtake the land, even if it at one point had been submerged before the CWA was enacted or if there have been subsequent lawful improvements to the land in its dry state.[15] In short, in such a situation, the waters of the United States are demarcated by the reach of the high tide line, but not as it would be in its unobstructed, natural state if the fill or obstruction was in place at the time the CWA was enacted or if there was a legally authorized filling or improvement done after the enactment of the CWA.

---

[15]This would not change the fact that waters which were in the past navigable are still considered such, even if they are no longer navigable in fact. *See United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 408 (1940) ("When once found to be navigable, a waterway remains so."); 33 C.F.R. § 328.3(a)(1). We also reiterate *Leslie Salt*'s admonition that the full extent of the Corps' CWA jurisdiction over waters of the United States "is in some instances not limited to the MHW or the MHHW line." *Id.* at 742. For example, where there are adjacent wetlands or intermittent streams, the Corps still has jurisdiction, even though these areas are beyond the normal ebb and flow of the tide. *See, e.g.*, *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139 (1985); *United States v. Moses*, 496 F.3d 984, 989 (9th Cir. 2007). Additionally, some discharges on dry land can be CWA violations. *See Leslie Salt*, 578 F.2d at 753 n.12 (citing *United States v. Holland*, 373 F. Supp. 665 (M.D.Fla. 1974), as an example of a discharge above MHHW line that violated CWA).

**[24]** Applying that boundary here, it is unclear from the evidence presented at summary judgment whether the high tide line actually reached the area where the Nicholsons excavated and filled. Pictures of the bulkhead reconstruction show that the rip-rap revetment seaward of the bulkhead may have successfully prevented the tide from reaching the area under construction. The construction diagrams show an intent to excavate to a depth that would be below the high tide line if one ignored the existence of the revetment. But if the revetment was in place prior to the enactment of the CWA or legally built on dry land after the passage of the CWA, then it must be considered as it actually exists. While the parties seem to agree that the revetment was built in 1982 by the Nicholsons' predecessor in interest, on summary judgment the government did not present evidence showing that the revetment was not lawfully built on dry land beyond the reach of the high tide line. There was also no evidence that during the reconstruction of the bulkhead, the Nicholsons placed additional rip rap seaward of the revetment or that their activities otherwise led to the discharge of material below the high tide line, as it actually existed. The government therefore did not carry its burden of showing that the Nicholsons had violated the CWA by discharging material into waters of the United States. Accordingly, we reverse the grant of summary judgment on this claim and remand for further proceedings.

Although the CWA's jurisdictional reach is generally broader than the RHA's, the reversal here is explained by the RHA's concern with preventing obstructions, on the one hand, and the CWA's focus on discharges into water, on the other. Since the two laws serve different purposes, their regulatory powers will diverge in some circumstances, as is the case here. Under the RHA, it is appropriate to ignore an obstruction's ability to stop the flow of navigable water, because the purpose of the RHA is precisely to prevent or remove obstructions to navigable waters. The Homeowners' structures clearly impinge on the capacity of the Strait of Georgia and portions of them sit within navigable waters;

they are therefore obstructions. The CWA, on the other hand, is designed to restore and maintain the integrity of the nation's waters, which it does by limiting the discharge of pollutants into the waters. *See* 33 U.S.C. § 1251(a). The Nicholsons' activities in reconstructing their bulkhead, however, would not involve a discharge into waters of the United States if conducted solely on fast land. The revetment fronting their bulkhead may have prevented the MHHW line from reaching the construction work—and thereby prevented a discharge into navigable waters—while at the same time obstructing those waters. It is perfectly consistent, then, that the Homeowners could be liable under the RHA while the Nicholsons may not be liable under the CWA.

## D.

Finally, for the court to award attorney's fees and costs under the EAJA, it must be shown that (1) the party seeking fees is the prevailing party; (2) the government has not met its burden of showing that its positions were substantially justified or that special circumstances make an award unjust; and (3) the requested fees and costs are reasonable. *See Perez-Arellano v. Smith*, 279 F.3d 791, 793 (9th Cir. 2002).

**[25]** To be a prevailing party, the party must have received an enforceable judgment on the merits or a court-ordered consent decree. *Id.*; *see Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) ("[E]nforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." (citation omitted)). The Milners and Bennett/Boyd stipulated to the government's dismissal, without prejudice,[16] of the CWA claims against them. However, although a defendant may no longer have a claim pending

---

[16]Since the stipulation did not state that the dismissal was with prejudice, it was without prejudice. Fed. R. Civ. Proc. 41(a)(1)(B).

against him or her upon dismissal, a dismissal without preju-
dice does not materially alter the legal relationship of the par-
ties, because the defendant remains subject to the risk of re-
filing. *Oscar v. Alaska Dep't of Educ. & Early Dev.*, 541 F.3d
978, 981 (9th Cir. 2008); *Cadkin v. Loose*, 569 F.3d 1142,
1149 (9th Cir. 2009). Although *Oscar* and *Cadkin* concern
fee-shifting statutes other than the EAJA, they turn on the
meaning of the term "prevailing party" and govern our inter-
pretation here. *See Perez-Arellano*, 279 F.3d at 794 (noting
that *Buckhannon* "sweeps . . . broadly and its reasoning is per-
suasively applicable to an award of attorney's fees under the
EAJA"); *Oscar*, 541 F.3d at 981 (relying on *Buckhannon* to
determine whether a defendant is a prevailing party); *Cadkin*,
569 F.3d at 1149 (same). We therefore conclude that the Mil-
ners and Bennett/Boyd are not prevailing parties and are not
entitled to attorneys' fees under the EAJA.

## IV.

Although this particular dispute has been ongoing for some
years now, for an even longer period of time, the Homeown-
ers on Sandy Point had an agreement with the Lummi Nation
to lease the tidelands. This allowed the upland owners to con-
struct and maintain bulkheads, rip rap, and other shore
defense structures on the tidelands in order to protect their
property. The Sandy Point Homeowners had an opportunity to
renew the lease for an additional 25 years, the maximum lease
term allowed for Indian trust lands. 25 U.S.C. § 415. Addi-
tionally, throughout this litigation the Lummi have expressed
a desire to negotiate a new agreement, and at least before
commencement of this suit, the United States indicated that its
concerns would be satisfied if the Homeowners entered into
agreements with the Lummi.

This action was avoidable. Perhaps the parties still will be
able to reach an amicable settlement. However, because the
Homeowners have so far been unable or unwilling to negoti-
ate an agreement with the Lummi, we must pass on the merits

of the dispute. For the reasons set forth above, we affirm the district court's decisions on the trespass and RHA claims, and its decision not to grant fees under the EAJA. We find that the government did not carry its burden on the CWA claim against the Nicholsons; we therefore reverse on that claim.

Each party is to bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**